DORI R. MERRIAM, TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Merriam v. Commissioner
Docket No. 26075-92.
United States Tax Court
T.C. Memo 1995-432; 1995 Tax Ct. Memo LEXIS 431; 70 T.C.M. (CCH) 627; September 6, 1995, Filed *431 Decision will be entered under Rule 155. Ted H. Merriam, for petitioner. John A. Weeda, for respondent. HAMBLEN, Chief Judge HAMBLEN
MEMORANDUM OPINION HAMBLEN, Chief Judge: Respondent determined that petitioner is liable as transferee of the assets of Napa Investment Corp. (Napa), transferor, in the amount of $ 1,154,034.56 for unpaid Federal corporate income tax and additions to tax due from Napa's taxable year ending September 30, 1986. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the 1986 taxable year, and Rule references are to the Tax Court Rules of Practice and Procedure. The issues for our decision are: (1) Whether petitioner is a transferee of Napa under section 6901 and Colorado State law and therefore liable for Napa's Federal income tax and additions to tax for Napa's taxable year ended September 30, 1986; (2) whether Napa is liable under section 6655 for an addition to tax for failure to pay estimated tax in the amount of $ 22,038.05; (3) whether Napa is liable under section 6651(a)(1) for an addition to tax for failure to timely file a corporate income tax return for the fiscal year ending September 30, 1986, *432 in the amount of $ 101,328.08; and (4) whether Napa is liable under section 6651(a)(2) for an addition to tax for failure to pay timely the corporate income tax it reported as due from the fiscal period ending September 30, 1986, in the amount of $ 50,795.91. Background
This case was submitted fully stipulated pursuant to Rule 122. The stipulation of facts with attached joint exhibits and the supplemental stipulation of facts are incorporated by this reference, and the facts contained therein are found accordingly. Petitioner resided in California at the time the petition was filed in this case. On June 15, 1983, Merriam Investment Corp. (MIC) was incorporated in and under the laws of the State of Colorado. On November 2, 1983, MIC changed its name to Napa Investment Corp. (hereafter both Napa Investment Corp. and Merriam Investment Corp. will be referred to as Napa for simplicity). Napa utilized the cash receipts and disbursements method of accounting. The initial board of directors of Napa consisted of petitioner, her husband, James A. Merriam, and her stepson, Ted H. Merriam, who was also the registered agent of the corporation. James A. Merriam and Ted H. Merriam resigned *433 as directors of Napa on September 1 and July 11, 1983, respectively. Thereafter, petitioner was the president, sole shareholder, and only director of Napa; however, James Merriam, petitioner's husband, made all decisions for petitioner regarding Napa at all times relevant to this case. In July 1983, Napa created Texas StateVideo Co. (TSV), a wholly owned subsidiary, which was incorporated in and under the laws of the State of Texas. TSV sold and franchised video tape rental stores. Napa contributed $ 100,000 to TSV in exchange for 10,000 shares of TSV's common stock. On August 3, 1983, Napa entered into a stock exchange agreement with Hammer Technologies, Inc. (HTI), by which Napa transferred all of its stock in TSV to HTI in exchange for 12 million shares of restricted common stock of HTI. After the exchange, TSV was a wholly owned subsidiary of HTI, and Napa owned 74 percent of HTI. James A. Merriam, petitioner's husband, was at all relevant times the president, chief executive officer, and chairman of the board of HTI. In October 1983 HTI acquired all of the outstanding common stock of Hammer Computer Systems, Inc. (HCS), in a section 368(a)(1)(B) reorganization with the sole *434 shareholder of HCS, at which time HCS was developing a computer software product. Consequently, by the end of 1983 HTI was a holding company which owned two wholly owned subsidiaries, TSV and HCS, and Napa was the majority owner of HTI, although Napa did not directly own any stock in either TSV or HCS. In September 1984, TSV completed a public stock offering which raised approximately $ 2 million from the public sale of its stock. In March 1985, HCS completed a public stock offering and also raised about $ 2 million from the public. In December 1985, HTI completed a public stock offering which raised approximately $ 2 million of equity capital, and Napa joined in this offering and sold some of its HTI stock. The primary source of Napa's income was from the sale of HTI stock from which it realized several million dollars in capital gains, specifically $ 2,835, $ 586,249, and $ 4,861,241 for the years ending September 30, 1984, 1985, and 1986, respectively. Also during its corporate existence Napa lent a total of $ 1,535,673.12 to petitioner (collectively referred to as Shareholder Loans) of which $ 1,527,091.12 was lent to petitioner during its final fiscal period ending September *435 1986. The Shareholder Loans are summarized as follows: Prior to Oct. 1985
[1] $ 7,582.00
Dec. 31, 1985
257,122.45
Mar. 30, 1986
421,843.22
June 30, 1986
703,503.90
Sept. 30, 1986
145,621.55
Total   1,535,673.12
Petitioner executed unsecured promissory demand notes payable to Napa for three of the above "loans" for the quarters ending December 31, 1985, March 30, 1986, and June 30, 1986. No promissory note was issued for the $ 145,621.55 Shareholder Loan, and acknowledgment and authorization appear only in Napa's corporate plan of liquidation. Petitioner did not repay any of the $ 1,535,673.12 she borrowed from Napa during its corporate existence, and the entire balance of the Shareholder Loans remained unpaid at the time of Napa's liquidation. During 1985 and 1986, Napa also loaned approximately $ 3,541,000 to several unrelated third parties. *436 Napa deducted $ 3,230,000 of this amount as bad debts on its final Federal corporate income tax return. The public market price of HTI stock rose from $ .50 per share in January 1985 to $ 14.75 per share on April 18, 1986. On April 19, 1986, the value of HTI stock started to plummet due, in part, to an unfavorable report in Barron's magazine. By April 28, 1986, the price of HTI stock had dropped to $ 1.31 per share, and by July 31, 1986, the market price was $ .19 per share. On June 12, 1986, Angus MacPherson sued Donaldson, Lufkin & Jenrette (DLJ), a New York brokerage firm, asserting, inter alia, that DLJ had wrongfully converted 30,000 shares of HTI stock at distressed prices. Thereafter the case was removed to the U.S. District Court for the Central District of California, and DLJ counterclaimed against Napa, HTI, TSV, HCS, James Merriam, petitioner, and others for $ 18 million, alleging that they conspired to commit securities fraud, engaged in unlawful insider trading, and illegally manipulated the price of HTI stock. Some of the parties in the lawsuit also were persons or companies to whom Napa had loaned nearly $ 3 million. Those parties/borrowers were Longmount Capital *437 Corp. (LCC) [2] ($ 2,495,000), Brenton Construction Corp. ($ 300,000), and David Lackey ($ 110,000) (collectively referred to as the Unrelated Borrowers). When Napa completed its plan of liquidation on September 30, 1986, the Unrelated Borrowers did not have the financial ability to repay their loans from Napa. The DLJ lawsuit was still in the discovery phase when Napa was liquidated, and the value of the loans was contingent upon whether the Unrelated Borrowers would have prevailed in the lawsuit against Napa. Extensive litigation ensued, and the lawsuit was ultimately settled in September of 1987. None of the Unrelated Borrowers, who had counterclaimed against DLJ, realized any recovery from the litigation. The only party realizing any recovery was Angus MacPherson. On August 4, 1986, petitioner initiated the liquidation process of Napa under Colorado State law. On August 12, 1986, Napa filed a statement of intent to dissolve with the Colorado secretary *438 of state. On October 20, 1986, Napa filed its articles of dissolution with the Colorado secretary of state. On September 30, 1986, Napa was liquidated, and petitioner surrendered all of her stock in Napa in exchange for a distribution by Napa to her of all Napa's assets. At the time of Napa's liquidation, petitioner could have repaid the face amount of the Shareholder Loans. While petitioner did not have the cash available to pay the Shareholder Loans, she would have had the ability to repay the Shareholder Loans if she had liquidated her assets. At the time of the liquidation, the HTI stock held by Napa was worthless. By reason of the liquidation, Napa was rendered insolvent and without the means to pay the corporate income tax in the amount of $ 461,781 it reported as due on its Federal corporate income tax return for the taxable period ending September 30, 1986. In connection with Napa's liquidation, the Shareholder Loans payable by petitioner to Napa were stamped "cancelled" and "paid" with the date September 30, 1986. The fourth and final loan from Napa to petitioner in the amount of $ 145,621.55 was contained in the final plan of liquidation and also was canceled as part of *439 the liquidation. Napa's plan of liquidation provided, in pertinent part, as follows: FURTHER RESOLVED, that Dori Merriam borrowed $ 145,621.55 from Napa from July through September, 1986; such loan (as well as all other outstanding loans from Napa to Dori Merriam) to be discharged upon the exchange and surrender by Dori Merriam of Napa common stock certificate number 1 (10,000 shares) as part of this Plan of Liquidation.
In addition to the forgiveness of the Shareholder Loans, Napa transferred $ 15,267.18 of other assets to petitioner as follows: (1) Walter Mack promissory note (value $ 10,000); (2) 8,086,662 shares of restricted common stock of HTI (value $ 0); and (3) cash in the Frontier bank accounts (value $ 5,267.18). James Merriam conferred with a national accounting firm that had prepared Napa's tax returns in the past about the expected tax due with regard to Napa's corporation income tax return for the period ending September 30, 1986. The accounting firm advised James Merriam that Napa would owe corporate income tax for that year in some unknown amount as a result of the profitable sales of HTI stock by Napa. There was also a question of whether the Unrelated *440 Borrowers' notes were deductible as worthless since the Unrelated Borrowers had substantial damage claims pending in the DLJ litigation at the time of Napa's liquidation. At the time of Napa's liquidation, the accounting firm advised James Merriam that it would be unable to compute Napa's actual tax liability with final certainty until after the DLJ litigation was completed and the worthlessness of the Unrelated Borrowers' notes was determined with finality and until it examined Napa's books and records. James Merriam advised petitioner not to sign Napa's return until he knew whether it was determined that the debts were worthless. He did not want to expose his wife or himself to what he believed might be substantial civil penalties or criminal prosecution by filing Napa's final tax return with a deduction in excess of $ 3 million until the status of those loans/debts was determined by the outcome of the DLJ litigation. He believed that it would be prudent for Napa to wait to file its final return until the DLJ case was completed. Napa determined in its plan of liquidation that as of September 30, 1986, the Unrelated Borrowers' notes were worthless. James Merriam believed that the *441 Unrelated Borrowers' notes would not have been worthless had the Unrelated Borrowers obtained substantial judgments in the DLJ litigation. During the DLJ litigation, James Merriam worked with his attorney on an almost daily basis from August of 1986 through September of 1987. Although petitioner and James Merriam devoted extensive time and energy to dealing with the DLJ lawsuit around the time that the tax returns were due, both were still able to conduct some business in their various enterprises. On October 28, 1986, the Securities and Exchange Commission (SEC) issued a formal order directing an investigation of Napa, HTI, petitioner, James Merriam, and others. On September 2, 1988, Napa filed an untimely Federal corporate income tax return with the Ogden Service Center for the taxable year ending September 30, 1986. On October 3, 1988, respondent sent a notice of demand for payment to Napa. Respondent assessed the amount of the tax liability reported by Napa for the taxable period ending September 30, 1986, plus the additions to tax and interest thereon. No part of the assessed tax liability has been paid, except for two estimated tax payments made by Napa in the total amount *442 of $ 11,434. As of July 20, 1992, the total amount of Napa's tax liability including additions to tax and interest as provided by law was $ 1,154,034.56, which is the amount of the deficiency contained on the statutory notice of transferee liability upon which this case is based. On August 24, 1992, a timely statutory notice of transferee liability was issued to petitioner for the taxable year of Napa ending September 30, 1986. Discussion
Issue 1. Transferee Liability
Pursuant to section 6901, [3] the Commissioner may collect from a transferee of assets the unpaid Federal income tax liability of the transferor. Stansbury v. Commissioner, 104 T.C. 486, 489 (1995); Gumm v. Commissioner, 93 T.C. 475, 479 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991). Section 6901 does not create or define the transferee's substantive tax liability, and the substantive basis for the assertion of transferee liability under section 6901 must be found in applicable State law. Commissioner v. Stern, 357 U.S. 39, 45 (1958) (interpreting section 311 of *443 the Internal Revenue Code of 1954, a predecessor to section 6901); John Ownbey Co. v. Commissioner, 645 F.2d 540, 543 (6th Cir. 1981), revg. T.C. Memo. 1978-482; United States v. Floersch, 276 F.2d 714, 717 (10th Cir. 1960). The Commissioner has the burden of proving the elements necessary to establish the taxpayer's liability as a transferee under State law, but the Commissioner does not have to establish the amount of the liability of the transferor. Sec. 6902(a); [4] *445 Rule 142(d). Further, the Commissioner has only the substantive rights against a transferee that other creditors have. Segura v. Commissioner, 77 T.C. 734, 742 (1981). It is generally required that the Commissioner show that attempts were made to collect the tax liability from the transferor before attempting to collect from the transferee, since the liability of the transferee is secondary. Bellin v. Commissioner, 65 T.C. 676, 683-684 (1975). If the Commissioner meets the burden of proof, the transferee is liable for the transferor's taxes due as of the time of the transfer, *444 as well as interest [5] and any additions to tax, to the extent of the value of the assets transferred. Estate of Glass v. Commissioner, 55 T.C. 543, 575-576 (1970), affd. 453 F.2d 1375 (5th Cir. 1972). In the case before us, respondent contends that petitioner, the only director of Napa, caused Napa to make a liquidating distribution of property valued at $ 1,550,940.30 to petitioner, the sole shareholder of Napa, on September 30, 1986. Respondent asserts that the property consisted of $ 5,267.18 in cash, a third-party promissory note valued at $ 10,000, and $ 1,535,673.12 in the form of discharge of the Shareholder Loans. Accordingly, respondent claims that petitioner, as transferee, is liable for Napa's unpaid Federal corporate taxes, various additions to tax, and interest up to $ 1,550,940.30, the amount of the purported transfer. Petitioner concedes she received property in the amount of $ 15,267.18 as a result of Napa's liquidation. However, petitioner contends that she did not receive property for the purpose of transferee liability in *446 the amount of $ 1,535,673.12 as a result of Napa's cancellation of the Shareholder Loans. Petitioner insists that she merely received her own promissory notes which were cancelled, discharged, paid, or otherwise voided and that such notes do not constitute property. Alternatively, petitioner argues that if the discharged Shareholder Loans constitute property, they have no value. The State law basis for the assertion of transferee liability is found at Colo. Rev. Stat. sec. 7-5-114(1)(c) (rep. vol. 1986) (sometimes referred to as the Director Dissolution Statute). Colo. Rev. Stat. section 7-5-114(1) provides, in pertinent part, as follows: (1) In addition to any other liabilities, a director shall be liable in the following circumstances unless he complies with the standard provided in this code for the performance of duties of directors: * * * * (c) A director who votes for or assents to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or the making of adequate provision for, all known debts, obligations, and liabilities of the corporation shall be liable to the corporation, *447 jointly and severally with all other directors so voting or assenting, for the value of such assets which are distributed, to the extent that such debts, obligations, and liabilities of the corporation are not thereafter paid and discharged.
The purpose of the Director Dissolution Statute is the protection of creditors. Accordingly, even though the statute makes each director "liable to the corporation" and not in terms liable to the corporation's creditors, the Colorado Supreme Court has held that all creditors of a corporation, as a group, may assert the Director Dissolution Statute on behalf of a corporation for their own benefit.[6]Ficor, Inc. v. McHugh, 639 P.2d 385, 393 (Colo. 1982). We have previously held that a director who receives a distribution as a shareholder may be held liable pursuant to the Director Dissolution Statute as a transferee under section 6901. Kean v. Commissioner, 91 T.C. 575, 611-612 (1988). Moreover, the Director Dissolution Statute imposes liability upon a director even if the director did not receive the assets of the corporation which were distributed to the corporation's shareholder(s) *448 during the liquidation of the corporation. Colo. Rev. Stat. sec. 7-5-114(1). Petitioner contends that the appropriate Colorado law is Colo. Rev. Stat. sec. 7-8-125 (1986) (Colorado Shareholder Statute), which imposes liability upon the shareholder(s) of a corporation who received assets from a liquidating corporation when the creditors of the corporation were not paid. The Colorado Shareholder Statute, which imposes liability upon a shareholder for the assets received by such shareholder in liquidation, and the Director Dissolution Statute, Colo. Rev. Stat. sec. 7-5-114(1)(c), *449 which imposes liability upon a director who causes a corporation to liquidate and to distribute assets to the shareholders without properly providing for creditors, are in pari materia and not mutually exclusive. Accordingly, we will first analyze and determine whether petitioner is liable under the Colorado Director Dissolution Statute. For ease of discussion we shall divide the Colorado Director Dissolution Statute into the three essential components which respondent must prove in order to establish liability upon a director of a corporation under Colorado law, as follows: (1) The director must cause the corporation to liquidate, (2) all known debts of the corporation are not adequately provided for in the liquidation, and (3) during the liquidation, the corporation distributes corporate assets to its shareholder(s). Colo. Rev. Stat. sec. 7-5-114(1). Petitioner was the sole director of Napa at all times relevant in this case and has stipulated that she initiated the liquidation process of Napa under Colorado State law on August 4, 1986. Accordingly, the first element of the Colorado Director Dissolution Statute is satisfied. The Director Dissolution Statute limits the scope of *450 a director's liability to debts of the corporation which are known at the time of the liquidation of the corporation. Ficor, Inc. v. McHugh, supra at 392 n.12. Petitioner does not dispute, and it is clear from the record, that the Federal corporate income tax liability of Napa was a known debt. See Kreps v. Commissioner, 42 T.C. 660, 670 (1964), affd. 351 F.2d 1, 10 (2d Cir. 1965). The Director Dissolution Statute extends the director's "liability to debts that go unpaid for any reason." Ficor, Inc. v. McHugh, supra at 395. Consequently, the second prong of the Director Dissolution Statute is satisfied. It is established that petitioner directed Napa to liquidate, that Napa transferred $ 15,267.18 worth of its assets ($ 5,267.18 in cash and a third-party promissory note valued at $ 10,000) to petitioner during its liquidation, that petitioner received $ 15,267.18 worth of assets from Napa during the liquidation, that Napa's creditors were not paid, and that Napa had no assets to pay its creditors after its liquidation. Accordingly, the requirements of component *451 (3) of the Director Dissolution Statute have been met, and consequently petitioner, as director of Napa, is liable as transferee, under section 6901, for the $ 15,267.18 worth of property which Napa distributed to her, as a shareholder of Napa. The dispute in this case focuses primarily on whether the cancellation of the Shareholder Loans during Napa's liquidation constitutes a distribution of property upon which transferee liability may be based. Petitioner's basic contention is that when her Shareholder Loans were discharged or forgiven, no property existed to which transferee liability can attach under Colorado law. Petitioner primarily relies on Elliott, Federal Tax Collection, Liens, and Levies, par. 1.5[10][c], at 1-20 (1988), to support her contention that a shareholder who receives her own note to a corporation in a liquidation exchange does not receive corporate assets since the note is deemed "discharged", "cancelled", or "forgiven". Professor Elliott states as follows: Forgiveness of a debt can raise questions of transferee liability. However, once a debt is forgiven, there is no property to which the [tax] lien can attach. Assume, for example, that a taxpayer (1) *452 owns a third party debt that has a lien attached to it and (2) forgives the debt. The forgiveness of the debt is in the nature of a forfeitable or terminable event. Therefore, it erases any form of property ownership. [Id.; fn. ref. omitted.]
Petitioner's reliance on Professor Elliott's treatise is misplaced, as it does not address the issue of transferee liability. Rather, it addresses the effect of debt forgiveness on a Federal tax lien attached to the debt which is forgiven. Petitioner confuses primary and secondary (transferee) liability. The fact that respondent may no longer collect from Napa on the primary liability does not prevent respondent from collecting on the secondary liability that arose upon the cancellation of petitioner's debt. On the contrary, the inability to collect on the primary liability is a key element of the transferee liability case. See Colo. Rev. Stat. sec. 7-5-114(1)(c) (rep. vol. 1986) (the transferee liability of the directors of a corporation is contingent on the corporation's inability to pay its creditors). Moreover, the treatise explicitly states that "Forgiveness of a debt can raise questions of transferee liability." Elliott, supra *453 par. 1.5[10][c], at 1-20. Petitioner contends that United States v. Steiner, 441 F. Supp. 1069, 1079-1080 (W.D. Wis. 1977), which is cited in the treatise, supports her position. However, the facts in the Steiner case are definitely distinguishable from the facts of this case. In Steiner, the United States alleged that a defendant had forgiven a debt of a codefendant, who was involved in and owed tax as part of a plan to defraud the Government. The defendant maintained that the codefendant had paid the debt, and that the debt was not forgiven. The Government failed to prove that the defendant's records that documented the payment of the codefendant's debt were fraudulent, and the court ruled for the defendant. The court declined to hold that the defendant had in fact forgiven the debt. Id. at 1079. The court in Steiner did not address the issue of transferee liability arising upon the cancellation of debt and held that no cancellation of debt had occurred. Accordingly, Steiner is neither dispositive nor helpful as it does not address the issues in this case. Petitioner's analogy to the tax lien scenario *454 is inapplicable in a transferee liability context. In a tax lien scenario, there is a Federal tax lien attached to the debt, and a taxpayer could arguably cancel the debt to defeat the attachment of the lien (a matter on which we express no opinion). In the transferee context, however, it is the very act of forgiving the debt itself that gives rise to the secondary, transferee liability. The cancellation of the Shareholder Loans, which were worth $ 1,535,673.12, caused a substantial reduction in Napa's assets and was accompanied by a concomitant benefit to petitioner, as the sole shareholder of Napa. It is the combined reduction in Napa's assets accompanied by a corresponding benefit to the shareholder that constitutes a transfer of property to petitioner, as a shareholder, within the meaning of section 6901(a)(1)(A) and gives rise to petitioner's liability as a director/transferee under the Colorado Director Dissolution Statute. Petitioner's contention that when Napa cancelled her various loans, she, as shareholder, received nothing from the corporation, which had nothing to distribute, is totally without merit and is not supported by the record. If a shareholder's debt to a corporation *455 is cancelled at the time of the corporation's complete liquidation, the cancellation of the debt is treated as a distribution in exchange for the shareholder's stock which is included in the amount realized by the shareholder on the liquidation.[7]Alexander v. Commissioner, 61 T.C. 278 (1973). The fact that petitioner reported the $ 1,535,673.12 debt cancellation income as an amount realized under section 331 on her 1986 Federal income tax return, as she was required to do, does not preclude respondent from basing transferee liability on the already-taxed discharge of indebtedness income. Healy v. Commissioner, 345 U.S. 278 (1953); Segura v. Commissioner, 77 T.C. at 747; Estate of Stein v. Commissioner, 37 T.C. 945 (1962); Meyers v. Commissioner, 21 T.C. 331 (1953). Whereas the amount previously reported by petitioner deals with her individual tax liability, the transferee liability relates to the transferor's corporate income tax liability. *456 In Segura v. Commissioner, supra at 743, we found transferee liability under similar facts and circumstances involving the application of a Louisiana shareholder statute. In Segura, the taxpayer/transferee contended that a dividend paid in the form of cancellation of indebtedness (shareholder loans) could not support transferee liability because no tangible transfer of cash or other property occurred. The transferee asserted that the corporation's discharge of the shareholder's debt was a mere book entry. We found that the entry cancelling the indebtedness constituted a transfer of assets to the shareholder under section 6901 because there was an actual reduction in the corporation-transferor's assets with a concomitant increase in value to the transferee. Id. at 746. A transfer of assets may exist where the transferee did not directly receive assets from the transferor corporation.[8]Kean v. Commissioner, 91 T.C. at 604; Fibel v. Commissioner, 44 T.C. 647, 658 (1965). We have long held the view that: corporate liquidating distributions paid for *457 a shareholder's benefit or at his direction in discharge of his debt or for some other personal purpose of his should be treated as a corporate liquidating distribution to said shareholder, capable of forming the basis of transferee liability in him, in respect of the tax liabilities of the distributor corporation. [Fibel v. Commissioner, supra at 658.]
In Commercial Fin. Co. v. Commissioner, T.C. Memo. 1968-229, we applied Colorado law to find shareholder transferee liability using the trust fund doctrine [9] for a corporation (Commercial) which released legally enforceable debts. Commercial was owned by Neil and the Estate of Cullen. Commercial had a note receivable and accounts receivable due from the Estate of Cullen. The Estate of Cullen was worth more than the *458 Commercial receivables. Commercial cancelled the receivables due from the Estate of Cullen. Thereafter, Commercial was liquidated and did not have sufficient assets to pay its Federal corporate income tax. Neil was one of two residuary devisees of the Estate of Cullen. We found that the assets were effectively transferred to Neil from Commercial (through the Estate of Cullen which acted as a conduit) by the release of the receivables. In this case, the Shareholder Loans were cancelled as part of the liquidation of Napa. There was clearly a reduction in Napa's assets when the Shareholder Loans, which could have been factored or sold to a third party, were eliminated and a concomitant benefit to petitioner even though she reported the *459 relief of indebtedness as a long-term capital gain on her income tax return. Petitioner has stipulated that she had the ability to repay the loans, and it is clear that the forgiveness of these liabilities effectively transferred assets from Napa to petitioner in the amount of the balances due from these loans and the accrued interest thereon. Whether or not a debt is a property interest of the creditor that terminates upon its cancellation is irrelevant to the issue of whether or not the cancellation of a promissory note can be the basis of transferee liability. The relevant inquiry is whether the transferor transferred property belonging to the transferor to the transferee in some fashion and thereby conferred a benefit on the corporation's shareholder(s) while creditors went unsatisfied. See Colo. Rev. Stat. sec. 7-5-114(1)(c) (rep. vol. 1986). Napa did not receive any consideration upon the transfer of all of its assets to petitioner. Bellin v. Commissioner, 65 T.C. at 683; Coca-Cola Bottling Co. v. Commissioner, 37 T.C. 1006 (1962), affd. 334 F.2d 875 (9th Cir. 1964). After the liquidation, *460 Napa was insolvent and did not have any assets with which it could pay its Federal tax liability. It is obvious to us that substantial value was transferred from and by Napa to and received by petitioner when petitioner's Shareholder Loans were cancelled. The fact that petitioner did not receive cash upon the discharge of her legally enforceable debts does not alter our analysis. We think it is disingenuous to the point of being chimerical for petitioner to argue that she did not receive any assets by being forgiven of her legally enforceable obligations. See Segura v. Commissioner, supra.There is no question that a valuable benefit was conferred upon petitioner, as shareholder and otherwise, by being forgiven of the debt. Petitioner would have us believe that as a director she can cause a corporation to make loans to its shareholder of substantially all of its assets and then cause the corporation to liquidate, forgiving these loans without making arrangements for the payment of the claims of creditors. This is exactly the type of situation in which transferee liability, or secondary liability, is imposed upon a transferee. Unsecured creditors *461 necessarily take the risk that a business may fail because of adverse economic conditions or unwise business decisions. However, they do not accept as a risk without remedy the possibility that a corporation will make substantial loans to its sole shareholder and formally forgive these loans in the corporation's plan of liquidation without making provisions for the payment of the corporation's debts. The Director Dissolution Statute imposed upon petitioner, as director of Napa, the duty to make an adequate provision for all known debts. Petitioner admits that she knew of the likely tax liability of Napa in July of 1986. Rather than paying back the substantial sums of money petitioner had borrowed from her corporation, which would have enabled Napa to pay its Federal tax liability, petitioner chose to liquidate Napa, cancelling all her debts and distributing all of Napa's assets to her, leaving Napa unable to meet its Federal tax obligations. When Napa was liquidated, Napa received no consideration except the surrender of its outstanding stock, and it was stripped of all its assets. On the basis of the entire record, we conclude and hold that assets of Napa were transferred from *462 Napa to petitioner, within the meaning of section 6901, by the forgiveness of petitioner's promissory demand notes. The evidence shows that petitioner received $ 1,550,940.30 worth of assets from Napa's liquidation. Petitioner gave nothing of value to Napa for the release of $ 1,535,673.12 of her Shareholder Loans and the receipt of $ 15,267.18 worth of other property. The liquidation stripped Napa of all its assets, and Napa was unable to pay its Federal income tax. Respondent, in establishing transferee liability, has proven that petitioner caused Napa to make liquidating distributions of $ 1,550,940.30 worth of Napa's assets to petitioner, who was Napa's sole shareholder, and that Napa failed to adequately make provisions to satisfy its Federal tax liability for the period ending September 30, 1986.[10] Accordingly, we find that respondent has met her burden in proving transferee liability under the Colorado Director Dissolution Statute. [11] Because we have concluded that petitioner is liable under section 6901(a) and Colorado State law as a transferee of Napa, we need not address respondent's alternative contention that petitioner is liable as transferee of the assets of Napa *463 under the "trust fund" doctrine. [12] Petitioner, as transferee, is liable for Napa's taxes in question, plus all accrued interest and additions to tax thereon, to the extent of the property transferred to petitioner upon the liquidation of Napa, which we have found to be $ 1,550,940.30. Issue 2. Additions to Tax
Respondent determined that petitioner, as transferee, is liable for additions to tax of Napa, for failure to timely file a return, failure to pay Federal income tax, and failure to make estimated Federal tax payments pursuant *464 to sections 6651(a)(1) and (2) and 6655, respectively. Petitioner does not contest the existence or the amount of the Federal corporate income tax liability of Napa for the period ending September 30, 1986; however, petitioner contends that Napa is not liable for the various additions to tax. Each of the additions to tax is discussed separately below. a. Failure To Timely File a Return
Section 6651(a)(1) provides that an addition to tax shall be imposed in case of failure to file a return on the date prescribed therefor, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. See Rule 142. Petitioner does not dispute that Napa's Federal corporate income tax return was filed late in this case; however, petitioner contends that the failure to timely file the corporate income tax return was due to reasonable cause and not due to willful neglect. While "reasonable cause" is not defined in the statute, reasonable cause has been defined to mean the exercise by a taxpayer of ordinary business care and prudence. Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840 (1957). Section 301.6651-1(c), Proced. & Admin. Regs., *465 provides that a late filing may have reasonable cause if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time. The term "willful neglect" means a conscious, intentional, or reckless indifference. United States v. Boyle, 469 U.S. 241 (1985). The question of whether reasonable cause exists is essentially one of the facts to be decided upon the particular circumstances of each case, and the burden of proof is upon petitioner. In our opinion the evidence falls short of establishing that the failure to timely file was due to reasonable cause. Napa's tax year ended September 30, 1986, and its Federal income tax return was due to be filed on December 15, 1986. Pursuant to sections 6012(a)(2) and 6072(b), Napa was under a duty to file a timely return for its final tax period. Petitioner does not dispute that Napa's Federal corporate income tax return was filed over 20 months late. On September 2, 1988, the Federal corporate income tax return of Napa was received by the Ogden Service Center. Petitioner contends that her involvement in the various litigation that preceded the liquidation *466 of Napa and continued for some time thereafter was so time consuming that it prevented Napa and her from filing a timely tax return. This contention, in other words, is an assertion that Napa's and her workloads were so heavy that Napa was unable to comply with its obligation to file a timely return. Even assuming that petitioner was overwhelmed by her business and financial affairs (a conclusion which is not supported by the record), we have held that a heavy workload and preoccupation with business affairs do not constitute reasonable cause for the untimely filing of a tax return. Therefore, petitioner's concentration on her financial affairs and her preoccupation with the litigation do not constitute a basis for reasonable cause for Napa filing an untimely return for the taxable period ending September 30, 1986. Crocker v. Commissioner, 92 T.C. 899, 913 (1989); Odend'hal v. Commissioner, 80 T.C. 588, 618 (1983), affd. and remanded on other grounds 748 F.2d 908 (4th Cir. 1984); Dustin v. Commissioner, 53 T.C. 491, 507 (1969), affd. 467 F.2d 47 (9th Cir. 1972). *467 Petitioner's reliance on Estate of Broadhead v. Commissioner, T.C. Memo. 1972-195, for her proposition that extensive litigation may constitute reasonable cause for failure to timely file misses the mark as the facts in Estate of Broadhead are manifestly distinguishable from the facts of this case. In Estate of Broadhead, the fiduciary income tax return at issue was filed 1 month and 1 day late, and we held that the taxpayer established reasonable cause for its failure to timely file by showing that: (1) State law required that accounts be reconciled and that advice by an attorney be obtained, (2) a court order was necessary for all action in the case, and (3) court litigation consumed time of the trustees. We are convinced that petitioner's and Napa's litigation does not rise to the level of a reasonable cause excuse for the late filing of Napa's 1986 return. Petitioner was not incapacitated on the date the return was due, nor has petitioner established that the litigation problem was so substantial and continuous that Napa could not have filed its return when due. The DLJ litigation was not so extensive that it took all of petitioner's time. *468 Petitioner was able to conduct some business in her various other enterprises, and petitioner chose not to have Napa timely file its Federal tax return. Petitioner further relies upon In re Sims, 71A AFTR 2d 93-4238, 92-1 USTC par. 50,034 (Bankr. E.D. La. 1991), for her contention that the addition to tax for late filing of Napa's return should not be imposed because the information that was needed to complete Napa's tax return was unavailable due to the DLJ litigation. In re Sims, however, dealt with the situation where the debtor/taxpayer had no control over the entities which had the necessary information and could not generate the records himself. Id. at 93-4239, 92-1 USTC par. 50,034 at 83,142. That is very different from the circumstances in this case in which the records needed to compute Napa's Federal income tax were available to petitioner, under the control of petitioner, and capable of being generated by petitioner. Petitioner argues that Napa's failure to timely file its Federal corporate tax return was reasonable because the information needed could not be determined until the resolution of the DLJ litigation. The DLJ litigation, *469 however, was settled in September of 1987, and Napa's return was not filed until September 2, 1988. Upon the basis of the record here presented, we cannot find that the failure to timely file was due to reasonable cause. Lack of sufficient funds to pay the Federal corporate income tax does not constitute reasonable cause for failure to timely file. Sanders v. Commissioner, 21 T.C. 1012, 1019-1020 (1954), affd. 225 F.2d 629 (10th Cir. 1955). We find that respondent properly determined an addition to tax under section 6651(a)(1) on Napa's return for the year in issue, and petitioner, as transferee, is liable therefor. b. Failure To Timely Pay
Section 6651(a)(2) provides that an addition to tax shall be imposed if a taxpayer fails to timely pay the amount of its Federal tax liability unless it is shown that such failure is due to reasonable cause and not due to willful neglect. A failure to timely pay Federal tax is considered excused for reasonable cause to the extent that the taxpayer shows that it exercised ordinary business care and prudence in providing for payment of its tax liability and was nevertheless either unable *470 to pay the tax or would suffer an "undue hardship" if it paid the tax on its due date. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In determining whether a taxpayer exercised ordinary business care and prudence, all of the facts and circumstances of a taxpayer's financial circumstances are taken into account, including the amount and nature of its expenditures in relation to its assets and the funds it could reasonably expect to receive prior to the date prescribed for the payment of the tax. Sec. 301.6651-1(c), Proced. & Admin Regs. "Undue hardship" requires more than an inconvenience to the taxpayer; it requires the risk of a substantial financial loss resulting from making the tax payment on time. Petitioner relies principally upon In re Pool & Varga, Inc., 60 Bankr. 722, 727-728 (Bankr. E.D. Mich. 1986), for the proposition that a taxpayer may avoid an addition to tax for failure to timely pay upon a showing that the taxpayer exercised ordinary business care and prudence, but was still either unable to pay or would suffer undue hardship if it paid the tax on time. Petitioner contends that the financial difficulties encountered by Napa constitute *471 reasonable cause. According to the bankruptcy court in the In re Pool & Varga, Inc. case, the taxpayer's difficulties would have to be so severe as to cause irreparable injury or terminate the taxpayer's business if the taxpayer timely paid the tax. Id. Petitioner adduces no evidence to support such a finding in this case. In fact, at the time that the tax would have been due, Napa had already been voluntarily terminated by the actions of petitioner when petitioner herself had the means to pay the tax directly or indirectly through borrowing on behalf of or through Napa. We consider the facts presented in the In re Pool & Varga, Inc. case to be substantially different from those presented herein. Petitioner claims that the unforeseen fall in the stock price of HTI constitutes reasonable cause for Napa's failure to timely pay its Federal corporate income taxes. Petitioner relies on Glenwal-Schmidt, Joint Venture v. United States, 42 AFTR 2d 78-5817, 78-2 USTC par. 9610 (D.D.C. 1978), where the District Court for the District of Columbia held that a taxpayer could not have foreseen that the Navy would not comply with its obligations *472 under its contract that caused severe financial hardship to the taxpayers. Petitioner asserts that in this case Napa could not have foreseen that the stock price of HTI would collapse leaving it unable to pay its tax obligation. However, there is nothing in the record to suggest that Napa could not have foreseen the collapse of the stock price or that it was unable to pay the tax when due. We find that the collapse of the HTI stock did not leave Napa unable to pay its Federal income tax. After the collapse of the HTI stock, Napa had assets substantially greater than its Federal tax liability. Napa had the Shareholder Notes due it from petitioner, which could have been used to pay the debt. Napa reasonably could have been expected to pay its corporate liabilities after the collapse of the HTI stock. Instead of making arrangements for the payment of Napa's Federal tax liabilities, petitioner chose to liquidate Napa, distribute all of its assets to its sole shareholder, and forgive its loans to that shareholder. Petitioner was the president, sole shareholder, and director of Napa, and petitioner's decision to liquidate Napa rather than pay Napa's taxes certainly does not constitute reasonable *473 cause or the exercise of ordinary care or prudence. In this case, the only reasons offered by petitioner were the extensive litigation in which the transferor and petitioner were engaged and the sudden collapse of the HTI stock, which do not justify a finding that ordinary business care or prudence was exercised or that an undue hardship within the meaning of the regulation occurred. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. We find that the addition to tax for failure to timely pay was properly imposed. Therefore, pursuant to section 6901, petitioner, as transferee, is liable for the addition to tax for Napa's failure to timely pay. c. Failure To Make Estimated Tax Payments
Section 6655 imposes an addition to tax in the case of any underpayment of estimated tax by a corporation. There is no exception to the imposition of the addition to tax under section 6655 for reasonable cause, and petitioner has not demonstrated that any of the available computational exceptions apply. See Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Napa computed the amount of the estimated tax penalty itself and reported it as $ 24,016 on line 33 of its Form *474 1120, an amount greater than that assessed by respondent. We sustain respondent's determination on this issue. Pursuant to section 6901 petitioner, as transferee, is liable for the addition to tax for Napa's underpayment of estimated tax. For the foregoing reasons, Decision will be entered under Rule 155. Footnotes
1. It is unclear from the stipulation of facts whether Napa lent petitioner $ 7,582 or $ 8,582 prior to 1985 due to a mathematical error in the stipulation.↩
2. LCC is wholly owned by Blair Merriam, James Merriam's nephew.↩
3. Sec. 6901(a) provides, in pertinent part: SEC. 6901(a). Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),↩
4. Sec. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof.--In proceedings before the Tax Court the burden of proof shall be upon the Secretary to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.↩
5. We have held that a transferee's liability for interest for the period prior to the issuance of the notice of transferee liability is to be determined under State law. Stansbury v. Commissioner, 104 T.C. 486, 491↩ (1995).
6. Where only one creditor is known, that creditor may bring the action on his, her, or its own behalf, without purporting to sue on behalf of all creditors. See Delgado Oil Co. v. Torres, 785 F.2d 857, 861↩ (10th Cir. 1986). The record in the instant case does not disclose the existence of any other creditors whose interest would be harmed by respondent's prosecution of her claim under the Director Dissolution Statute.
7. A shareholder's gain or loss from a distribution in complete liquidation is determined under sec. 1001 by comparing the amount of the distribution with the basis of the shareholder's stock. Sec. 1.331-1(b), Income Tax Regs.↩
8. This is not the only situation where cancellation of a shareholder's indebtedness by a corporation is treated as a distribution of property. See sec. 1.301-1(m), Income Tax Regs.↩
9. The trust fund doctrine makes a shareholder liable as a transferee following any distribution after which the transferor is insolvent. The assets that a shareholder receives from an insolvent corporation are deemed to be held in a trust fund in favor of the corporation's creditors.↩
10. We note that petitioner, in her capacity as president of Napa, appears to have been derelict in her duty under Colo. Rev. Stat. sec. 7-8-105↩ (1986), to collect all assets and to make sure that the creditors were paid before distributing the remainder of Napa's assets to petitioner.
11. Accordingly, we do not address petitioner's liability under the Colorado Shareholder Statute.↩
12. See Kean v. Commissioner, 91 T.C. 575, 611↩ n.46 (1988).