T.C. Memo. 2005-17

UNITED STATES TAX COURT

DORI R. MERRIAM, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 26075-92.            Filed February 1, 2005.

<u>Patrick E. McGinnis</u>, for petitioner.

<u>John A. Weeda</u>, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  This case is before the Court on
petitioner's motion for special leave to file motion to vacate
decision and motion to vacate decision.

_____

[*] This Memorandum Findings of Fact and Opinion supplements
<u>Merriam v. Commissioner</u>, T.C. Memo. 1995-432, affd. without
published opinion 107 F.3d 877 (9th Cir. 1997)

In a prior opinion issued in this case, we held that petitioner was liable as a transferee for Federal income tax owed for the year ending September 30, 1986, by Napa Investment Corp. (Napa). Merriam v. Commissioner, T.C. Memo. 1995-432, affd. without published opinion 107 F.3d 877 (9th Cir. 1997). Petitioner was president and sole shareholder of Napa. James Merriam, petitioner's then-husband, ran Napa. He signed petitioner's name to many Napa documents. Petitioner personally signed many other Napa documents including a consent to action which stated that she, as sole director, approved Napa's lending substantial sums to her, a promissory note stating that she borrowed substantial sums from Napa, and Napa checks including checks payable to her.

James Merriam arranged for his son from a prior marriage, Ted Merriam, to represent petitioner in that proceeding. The case was fully stipulated under Rule 122. Petitioner contends that (1) the stipulation erroneously overstated her role in Napa, which caused the Court to decide erroneously that she was liable as a transferee; (2) she had no knowledge of the existence of the case until after decision was entered; and (3) these circumstances constitute fraud on the Court.

The sole issue for decision is whether fraud on the Court occurred in this case. We hold that it did not.

Unless otherwise indicated, section references are to the Internal Revenue Code as amended. Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner

Petitioner was a resident of California when the petition was filed. Petitioner graduated from the University of Southern California in 1963 with a degree in psychology.

Petitioner married William D. Lusk (Lusk) in 1966. In 1979, they were divorced, and petitioner married James Merriam. Also in 1979, petitioner received her home in Newport Beach, California, as part of the marital settlement agreement with Lusk. In 1980, petitioner sold her Newport Beach home for $1.4 million and received net proceeds of $876,936.

In 1981, petitioner and James Merriam paid $1,005,000 to buy a 7,000-square-foot residence in Tiburon, California (Tiburon residence). Petitioner paid a deposit of $201,000 and earnest money of $350,026.28, and she and James Merriam borrowed $550,000 to buy that residence.[1] James Merriam signed a quitclaim deed on March 12, 1981, in which he relinquished any interest that he might have had in the Tiburon residence.

---

[1] The parties do not explain why payments for the Tiburon residence do not equal its cost.

Petitioner and James Merriam lived in the Tiburon residence. Petitioner ran the family household. James Merriam controlled their business and tax matters.

B.   Ted Merriam

Ted Merriam graduated from law school in 1978. He received a Master of Laws degree in taxation in 1982 and has practiced tax law in Denver, Colorado, since then. Ted Merriam and his family visited James Merriam and petitioner in California three or four times a year from 1983 to 1999. Ted Merriam did legal work related to James Merriam's business activities, but he very rarely spoke to petitioner about business or tax matters.

Petitioner signed joint individual tax returns that Ted Merriam prepared for her and James Merriam. Petitioner knew that Ted Merriam had prepared those returns. Petitioner signed a Form 2848, Power of Attorney, in which she and James Merriam authorized Ted Merriam to represent them before respondent with respect to their 1986 joint return. Ted Merriam received several Forms 2848 purportedly bearing petitioner's signature,[2] including one relating to petitioner's transferee liability.

_____

[2] James Merriam frequently signed petitioner's name to documents. If the record shows that petitioner actually signed a document, we state that she signed the document. Where the record indicates that her signature appears on a document but does not indicate that she signed it, we state that the document "purportedly" bears her signature.

C. James Merriam's Business Activities

1. James Merriam's Early Businesses

In the late 1960s and 1970s, James Merriam started the Sir Speedy Printing Centers franchise business and other franchise businesses. In the early 1980s, he started Texas State Video Co., which he envisioned would become a nationwide video rental franchise business. James Merriam raised about $2 million in a stock offering relating to the video franchise company.

2. James Merriam's Offices, Office Staff, and Procedures

James Merriam had offices at the Tiburon residence and at other locations. He had numerous corporations and bank accounts.

James Merriam and members of his office staff received and sorted mail delivered to the Tiburon residence. James Merriam gave petitioner mail not related to his businesses or taxes. James Merriam told his staff not to give petitioner any information about his businesses.

3. Napa

Ted Merriam incorporated Merriam Investment Corp. (MIC) in Colorado in 1983 and was its registered agent. MIC was Napa's predecessor. Initially, the members of the MIC board of directors were James Merriam, Ted Merriam, and petitioner. James and Ted Merriam resigned as directors shortly after MIC was incorporated and before MIC changed its name to Napa. Thereafter, petitioner was the president, sole shareholder, and

only director of Napa. James Merriam ran Napa and made all of the decisions for Napa. Napa, a holding company, owned 12 million shares of Hammer Technologies Inc.

Ted Merriam prepared Napa's corporate minutes, resolutions and other legal documents and kept track of distributions from Napa bank accounts. Napa conducted business through consents to action.[3] Ted Merriam prepared hundreds of Napa documents for petitioner to sign and mailed them in envelopes addressed either to her or to James Merriam. Those documents were returned to him purportedly bearing petitioner's signature.

Petitioner personally signed the following Napa documents: (a) A promissory note dated March 31, 1986, in which she promised to pay Napa $421,843.22 on demand but no later than March 31, 1992; (b) a consent to action in which she, as sole director of Napa, approved loans from Napa to her from April through June 1986 totaling $702,503.90[4] in exchange for her promissory note to Napa in that amount; and (c) at least 54 Napa checks, including 12 payable to her. On two of the checks dated in February 1985 and made payable to her, petitioner wrote "Napa Investment Corporation" above her signature.

_____

[3] A consent to action is a document signed by the directors of a corporation in lieu of a board meeting.

[4] The parties erroneously stipulated that this amount was $703,503.90 in the underlying case. The discrepancy does not affect our decision to deny petitioner's motion to vacate decision.

Petitioner signed several checks made payable to the IRS on which appeared Napa's taxpayer identification number. Petitioner also signed some Napa checks payable to lawyers and to James Merriam's bookkeeper. James Merriam frequently signed petitioner's name on Napa documents, including checks.

Ted Merriam prepared articles of dissolution for Napa on October 17, 1986. Petitioner's signature as president and Ted Merriam's signature as secretary on this document were notarized by Diane Lalosh (Lalosh), an administrative assistant of James Merriam. Ted Merriam did not talk to petitioner about the decision to liquidate Napa.

James Merriam was a party to many lawsuits in which it was alleged that he had violated securities laws. Petitioner knew that James Merriam was a party to many lawsuits. Petitioner, James Merriam, and Napa were defendants in a lawsuit in which Burton Finkelstein (Finkelstein), an attorney, represented petitioner and James Merriam. Petitioner signed a $25,000 Napa check payable to Finkelstein to retain him for legal services. Finkelstein represented petitioner in a deposition taken in that case.

Petitioner received substantial amounts each month from Napa, totaling about $1.5 million in a 2-year period before September 30, 1986. In June 1986, about 3 months before Napa liquidated, petitioner bought a Rolls Royce automobile.

D.    The Tax Court Case

Napa reported an unpaid tax liability of $474,363 on its corporate income tax return for its year ending September 30, 1986.  Respondent determined that petitioner was liable as a transferee of Napa.  Respondent sent a notice of transferee liability to petitioner's Tiburon residence and a copy to Ted Merriam in Colorado.

James Merriam asked Ted Merriam to represent petitioner in this case, and Ted Merriam agreed.  James Merriam told Ted Merriam to send the legal bills related to this case to James Merriam.

Ted Merriam timely filed a petition in this case in 1992. He sent copies of all documents related to the case in envelopes addressed to James Merriam or petitioner.  He designated Denver as the place of trial, and he listed petitioner as a witness in his pretrial memorandum.

The case was submitted fully stipulated under Rule 122 in 1994.  Ted Merriam signed the stipulation of facts without discussing it with petitioner.  In an opinion filed in this case on September 6, 1995, we found that petitioner was the sole director and shareholder of Napa, James Merriam made all decisions for her regarding Napa, she had borrowed money from Napa as shown by promissory notes bearing her signature, she caused Napa to be liquidated, and, as part of the liquidation,

she distributed to herself cash and a note and canceled promissory notes that she had signed. We held that petitioner was a transferee of Napa under former Colo. Rev. Stat. sec. 7-5-114(1)(c) (1986) (Director Dissolution Statute) because she caused the corporation to liquidate, and she distributed corporate assets to herself. Merriam v. Commissioner, T.C. Memo. 1995-432.

We entered decision that petitioner was liable as a transferee for Napa's 1986 income tax and additions to tax for 1986 in the amount of $1,154,034.56. The case was appealed to and affirmed without published opinion by the U.S. Court of Appeals for the Ninth Circuit. Ted Merriam discussed collection alternatives with James Merriam after the decision became final.

Ted Merriam never spoke to petitioner about the case. He believed that: (a) Petitioner had signed Napa corporate documents; (b) petitioner knew that she was a shareholder, director, and officer of Napa; (c) James Merriam kept petitioner informed of important business and tax matters; and (d) petitioner had expressly authorized James Merriam to act on her behalf in this case.

E.    Sale of the Tiburon Residence

On February 22, 1996, IRS agent Michael Buttress (Buttress) went to the Tiburon residence and gave petitioner some

paperwork.[5] Petitioner gave the paperwork to James Merriam. Buttress went to the Tiburon residence many times. Petitioner never spoke to him about respondent's sale of the Tiburon residence; however, she knew that Ted Merriam had been communicating with respondent about selling the Tiburon residence, and she believed that Ted Merriam was representing her regarding respondent's sale of the house.

On July 19, 1996, petitioner wrote a letter to Buttress in which she said that Ted Merriam had told petitioner and James Merriam that their real estate agent was advertising the sale of the house, the proceeds from which they could use to pay delinquent taxes.

On February 25, 1997, Buttress visited the Tiburon residence and gave petitioner some paperwork including a notice of seizure and a minimum bid worksheet that listed petitioner as the taxpayer with a liability of $1,800,451.32 and the Tiburon residence as the subject property. James Merriam was not at home at the time. Petitioner called Ted Merriam. Ted Merriam told petitioner to fax the paperwork to him. Later that day, petitioner faxed that paperwork to Ted Merriam with a transmittal letter that included the following:

> Mike Buttress was just here and gave me the
> following minimum bid worksheet.

---

[5] Petitioner testified that this was the first time that she knew about her transferee liability.

He asked if we were going to have the house appraised again and I told him that we would be talking to you and let him know.

Jim is up in Roseville today, returning this evening.

Looking forward to seeing you on Saturday!!

On that day, James Merriam took the paperwork from petitioner and told her that he would take care of it.

The Tiburon residence was sold on August 6, 1999. Respondent received $1,815,539 from the sale, which fully paid petitioner's transferee liability.

F.  Later Events

James Merriam began serving a sentence in Federal prison in January 2002 for securities crimes not related to this case. Petitioner filed for divorce from James Merriam in 2002.

Petitioner retained her current counsel in this case in August 2002.  Petitioner filed her motion for special leave to file motion to vacate decision on July 31, 2003.

OPINION

A.  Petitioner's Contentions

Petitioner moves to vacate the decision in this case on the grounds that it resulted from fraud on the Court by James Merriam and Ted Merriam.  Petitioner contends that James Merriam and Ted Merriam conspired to hold her liable for Napa's income tax liability.  She also contends that the stipulation of facts submitted by Ted Merriam is almost entirely false and is based on documents bearing her forged signature, and that she did not

retain Ted Merriam to represent her in this case or authorize anyone else to retain him.

B.    Whether the Decision Was Entered as a Result of Fraud on the Court

    1.    Background

Generally, we lack jurisdiction to vacate a decision once it becomes final.  Abatti v. Commissioner, 859 F.2d 115, 117-118 (9th Cir. 1988), affg. 86 T.C. 1319 (1986); Cinema '84 v. Commissioner, 122 T.C. 264, 270 (2004).  However, we have jurisdiction to set aside a decision obtained by fraud on the Court.  Toscano v. Commissioner, 441 F.2d 930, 933-934 (9th Cir. 1971), vacating 52 T.C. 295 (1969).

Fraud on the court is an unconscionable plan or scheme which is designed to improperly influence the court in its decisions.  Abatti v. Commissioner, supra at 118.  With specific facts which plainly impugn the official record, the moving party must establish by clear and convincing evidence that decision resulted from fraud on the court.  Drobny v. Commissioner, 113 F.3d 670, 677 (7th Cir. 1997) (quoting Kenner v. Commissioner, 387 F.2d 689, 691 (7th Cir. 1968)), affg. T.C. Memo. 1995-209; England v. Doyle, 281 F.2d 304, 309-310 (9th Cir. 1960); Atchison, Topeka & Santa Fe Ry. Co. v. Barrett, 246 F.2d 846, 849 (9th Cir. 1957).  The concept of fraud on the court applies narrowly in the

interest of preserving the finality of judgments.  Toscano v. Commissioner, supra at 934.[6]

    2.   Whether Fraud on the Court Occurred in This Case

        a.   Whether the Decision Was Based on a False Stipulation of Facts

Petitioner contends that James Merriam and Ted Merriam submitted a false stipulation of facts.  Petitioner contends that, contrary to the stipulation of facts, the following statements are true: (i) She was not the president and sole shareholder of Napa; (ii) she did not borrow money from Napa; and (iii) she did not know anything about Napa except that it was one of James Merriam's companies.

At the hearing on her motion, petitioner testified on direct examination that she had no role in Napa, she did not know anything about Napa except that it was one of James Merriam's companies, and she did not sign promissory notes or any other Napa documents.  She testified that she first learned that promissory notes with her signature existed in April 2002.  She testified that she never borrowed money from Napa.  She testified and contends that she was not involved with Napa, including the decision to liquidate it.

---

[6] We reach this result without requiring petitioner to show prejudice.  See Dixon v. Commissioner, 316 F.3d 1041, 1046 (9th Cir. 2003), revg. T.C. Memo. 1999-101.

We decide whether a witness is credible on the basis of objective facts, the reasonableness of the testimony, and the demeanor of the witness.  Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Pinder v. United States, 330 F.2d 119, 124-125 (5th Cir. 1964); Concord Consumers Hous. Coop. v. Commissioner, 89 T.C. 105, 124 n. 21 (1987).

On cross-examination, when presented with documents offered to impeach her testimony, petitioner admitted that she had signed (1) a promissory note in which she promised to pay Napa $421,843.22; (2) a consent to action in which she, as sole director, approved loans from Napa to her totaling $702,503.90 in exchange for her promissory note; and (3) at least 54 Napa checks, including 12 payable to her.

Petitioner is a college graduate.  We believe that petitioner knew that she could not sign a corporate check without authority from Napa.  Petitioner denied knowing anything about Napa's liquidation and testified that she did not sign the Napa liquidation document.  However, her signature on that document was notarized.  Although the notarization was made by Lalosh, an employee who worked in James Merriam's office, Lalosh testified in this case on matters other than the notarization, and we have no reason to doubt her integrity or the validity of the notarization.

Petitioner contends that Lalosh testified that petitioner had no role in Napa. We disagree. Lalosh testified about James Merriam's office procedures, that petitioner signed several Napa checks, and that James Merriam signed Napa documents. Lalosh did not testify that petitioner had no role in Napa.

Petitioner denies receiving substantial sums from Napa. Our bases for finding that she received about $1.5 million in a 2-year period are that: (a) Petitioner said that she received monthly payments from Napa for household expenses; and (b) Ted Merriam testified that (i) James Merriam wanted petitioner to receive at least $20,000 to $30,000 per month for that purpose; (ii) Napa gave petitioner $1.5 million in a 2-year period; and (iii) petitioner gave Napa $1.5 million in notes during that period. The hearing record for petitioner's motion includes the three Napa checks payable to and signed by petitioner: $9,000 on April 15, 1985, $9,000 on April 22, 1985, and $5,000 on April 24, 1985. These checks, the consent to action, and the promissory note that petitioner admitted that she signed show that petitioner received substantial sums from Napa. We are not convinced that the submission to the Court of the stipulation of facts was fraud on the Court.

b.  Whether Ted Merriam Filed the Petition in This
    Case Without Authority

Petitioner contends that Ted Merriam failed to inform her about the case because he and James Merriam conspired to have her held liable as a transferee.  We disagree.

The tax year in issue is 1986.  We do not believe that James Merriam and Ted Merriam conspired to make petitioner liable as a transferee for 1986.  Petitioner and James Merriam had been married for 7 years in 1986 and remained married another 16 years.  Petitioner and James Merriam remained married 8 years after the stipulation was filed.  We do not believe that James Merriam, who lived at the Tiburon residence with petitioner until it was sold in 1999, conspired to lose that residence to the tax collector.  If Ted Merriam had not filed the petition, respondent could have assessed the proposed transferee liability and begun collection activity in 1992 rather than 1996.

We are not convinced that James Merriam and Ted Merriam sought to have petitioner held liable as a transferee.

C.  Conclusion

We conclude that petitioner has not shown by clear and convincing evidence that fraud on the Court occurred in this case.

An appropriate order
will be issued.