T.C. Memo. 2000-201

UNITED STATES TAX COURT

RICHARD L. AND KELLY D. ROBSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15716-97.                    Filed June 29, 2000.

<u>William D. Sutter, Jr.</u>, for petitioners.

<u>Henry N. Carriger</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined a deficiency of

$14,782 in petitioners' Federal income tax for the taxable year

1993.  The sole issue for decision[1] is whether petitioners

_____

[1]The only other issue raised by the notice of deficiency is
computational.

realized a capital gain during 1993 as a result of a liquidating
distribution under section 331(a)(1).[2]

                          FINDINGS OF FACT

     Some of the facts have been stipulated and are so found.
The stipulation of facts is incorporated herein by this
reference.  Petitioners resided in York, Nebraska, when they
filed their petition in this case.  References to petitioner are
to Richard L. Robson.

     Petitioner has worked in the insurance industry since his
graduation from college in 1963 with a degree in education.  On
or about March 4, 1980, petitioner and James Klute (Klute)
decided to purchase all of the stock of Mid-Nebraska Insurors,
Inc. (Mid-Nebraska), a local insurance agency.  To effect that
purchase, Mid-Nebraska borrowed $33,175 from York State Bank and
Trust Co. (York).  Mid-Nebraska then lent the proceeds to
petitioner and Klute, and they used them to purchase the stock of
Mid-Nebraska.  To evidence Mid-Nebraska's loan to them,
petitioner and Klute signed a certificate of indebtedness (note)
in which they jointly and severally promised to pay Mid-Nebraska

-----

[2]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.  For convenience, all monetary amounts are rounded to
the nearest dollar.

$33,175 with interest at 15 percent per year on the unpaid balance. Immediately after the purchase, petitioner and Klute each owned 50 percent of the stock of Mid-Nebraska.

Mid-Nebraska struggled financially. It borrowed additional funds from York, from Klute's spouse (Mrs. Klute), and from his company, Klute Land & Cattle Co., Inc. (Klute Land & Cattle). Klute eventually decided to terminate his relationship with Mid-Nebraska. Consequently, on or about February 17, 1983, Mid-Nebraska redeemed all of Klute's stock, he resigned all of his positions with that corporation, and it released him from any further liability on the note and any debts or notes Mid-Nebraska owed York. Mid-Nebraska also agreed to pay $22,000 to Mrs. Klute and $23,000 to Klute Land & Cattle in payment of the money it owed them. Mid-Nebraska paid the $22,000 to Mrs. Klute. Of the $23,000 owed to Klute Land & Cattle, Mid-Nebraska paid Klute $8,000 on or about February 17, 1983, and gave him a note for the balance due, payable in three annual installments of $5,000 each commencing March 1, 1984. Klute ultimately received only one $5,000 payment.

After the redemption of Klute's stock, petitioner was Mid-Nebraska's sole shareholder, and he alone was responsible for repayment of the $33,175 loan from Mid-Nebraska. Neither Mid-Nebraska's payments to Klute, Mrs. Klute, and Klute Land & Cattle nor its failure to pay the sums owed Klute affected petitioner's

basis in Mid-Nebraska. He was not liable for, nor was he required to make, any of those payments.

Mid-Nebraska continued to struggle financially. Petitioner borrowed money from his spouse and against his life insurance and his 401(k) plan to put into Mid-Nebraska. It is not clear, however, how much additional money petitioner ultimately put into the business, or whether Mid-Nebraska's bookkeepers and accountants treated the money as capital contributions or loans to the corporation on its books and records, or whether Mid-Nebraska repaid to petitioner any of that money before September 8, 1992.

During 1988 or 1989, Dean Sack (Sack), York's president, chairman of the board, and principal owner, advised petitioners to purchase the office space in the condominium building in which Mid-Nebraska had located its offices (office condominium). To effect the purchase of the office condominium and to satisfy certain bank lending policies, York lent Mid-Nebraska $16,000. Mid-Nebraska then lent the money to petitioners, and they used it to make a downpayment toward the purchase of the office condominium. Petitioners borrowed the balance of the $89,000 purchase price of the office condominium from York, and they agreed to make monthly payments toward repayment of that loan. Petitioners purchased the office condominium in their own names, and they considered it to be a personal asset. From the time

Sack approached petitioners about the purchase of the office condominium through at least some time after the audit of their 1993 return, petitioner did not understand the nature of or rationale for the financial arrangements made regarding that purchase.

Mid-Nebraska also periodically borrowed money from York for operating expenses. In August 1992, petitioner asked York to cover a $19,000 overdraft to USF&G Insurance Co. York refused. Instead, Sack informed petitioner that York would take over Mid-Nebraska's business, but York would allow petitioner to operate the insurance business as an employee of the bank. During the preliminary discussion of the terms of York's acquisition of Mid-Nebraska's business, Roger Sack, Sack's son, told petitioner that York would fire petitioner if he attempted to retain an attorney to advise him about the transaction. Sack determined all of the terms of the acquisition, and petitioner had no voice in the matter.

On August 17, 1992, Sack, on behalf of York, and petitioner signed a letter of intent. The letter of intent stated, among other things, that "It is hereby acknowledged that Mid-Nebraska Insurors is deficient in working capital and proposes to sell their corporation, including all assets, to the York State Bank

for $30,000, and the cancellation of their note payable to the York State Bank for approximately $97,000." The letter of intent further stated, among other things:

> This is a temporary agreement made subject to further details but with the understanding that Dick Robson has the option to buy the corporation back from the bank at any time for the amount the bank has paid for it plus earnings of 1% per month for the time they have had their money invested in the corporation.

In connection with the acquisition, York wrote a letter dated August 31, 1992, to the State of Nebraska Department of Banking and Finance (bank regulators) seeking their approval for York's purchase of Mid-Nebraska's business. In that letter, York represented that "the Bank will acquire the business and certain fixed assets from the present corporation for an amount not to exceed one and one-half times the gross annual commissions." The bank regulators expressed approval for the transaction in a letter to York dated September 3, 1992, in which they cautioned York that it could not purchase the stock of Mid-Nebraska.

On September 8, 1992, Sack, on behalf of York, and petitioner, on behalf of Mid-Nebraska, executed an agreement regarding the "Acquisition of Mid-Nebraska Insuror's fixed assets and good will" (acquisition agreement). The acquisition agreement states, among other things:

> York State Bank and Trust Company will pay the seller an amount equal to the total of the following, not to exceed $167,000:

> Bank overdraft on closing day;

Principal plus accrued interest on YSB term loan;
Payoff amount of vehicle loan;
Accounts Receivable;
An additional amount equal to the excess of Accounts
Payable over Accounts Receivable.

At the option of York State Bank and Trust Company,
seller will assign all rights to leases for Fixed
Assets (Office F and F), and execute a Bill of Sale for
Furniture and Fixtures.

Seller will assign all rights to Agency Contracts with
insurance carriers.

 *  *  *  *  *  *  *

All future commission income of the seller will be the
property of the buyer with the exception of Life
Insurance Commission and/or Renewals, which shall
remain the property of the seller. * * *

Dick Robson agrees to enter into an Agreement for
Employment with York State Bank and Trust Company,
d/b/a Mid-Nebraska Insurors.  Included in such
Agreement shall be a non-competition clause covering a
period of two years after termination of employment for
any reason, whether voluntary or otherwise. * * *

York State Bank and Trust Company agrees with the
Seller that for a period of three years an option will
be granted the Seller to repurchase the assets covered
under this agreement for a total equal to the
unrecovered investment in the original purchase price
plus a sum equal to 12% per annum for each year or part
thereof in which the York State Bank and Trust Company
has any unrecovered investment. * * *

From September 8, 1992, until petitioner repurchased the

insurance agency in 1994, York operated an insurance business

under the name "Mid-Nebraska Insurors".  When York acquired that

business, Mid-Nebraska owed liabilities of over $158,890, of

which it owed York $151,890 for loans and an overdraft in the

corporate bank account.  Following York's acquisition of Mid-

Nebraska's business, York wrote off the $151,890 and paid $7,000 of Mid-Nebraska's accounts payable, for a total purchase price of $158,890.

On April 22, 1993, petitioner, on behalf of Mid-Nebraska, and Sack, on behalf of York, executed an addendum to the acquisition agreement purportedly changing the allocation of the sale price on assets other than fixed assets as follows:

| Item | Amount |
|------|--------|
| Employment agreements | $16,372 |
| Customer list | 130,978 |
| Noncompete | 1,489 |
| Total | 148,839 |

Petitioner signed and filed Mid-Nebraska's Form 1120, U.S. Corporation Income Tax Return, for the year ended December 31, 1992 (1992 return), on October 15, 1993. The 1992 return reported, among other things, a capital gain of $125,645 and ordinary gain of $13,760 from the sale of property consisting of "vehicle, accts receivable, non-compete, employment agreements, customer list, goodwill". Form 4797, Sales of Business Property, filed with the 1992 return showed the following calculation of the capital gain and ordinary gain:

```
Gross sale price                                              $158,890
Less:
 Cost or other basis
  plus expense of sale                   $33,245
 Less depreciation                        13,760
Adjusted basis                                                 19,485
 Total gain from sale of property                            139,405
 Less:
  Ordinary gain (depreciation claimed
    on section 1245 property)                                  13,760
Capital gain                                                  125,645
```

Form 8594, Asset Acquisition Statement, filed with the 1992

return showed the allocation of the total $158,890 sale price as

follows:

| Assets | Aggregate fair market value | Allocation of sale price |
|--------|-----------------------------|--------------------------|
| Class I (Cash) | $2,000 | $2,000 |
| Class II | -- | -- |
| Class III | 184,251 | 156,890 |
| Total | 186,251 | 158,890 |

Form 8594 also showed a breakdown of the intangible amortizable

class III assets as follows:

| Assets | Fair market value | Allocation of sale price |
|--------|-------------------|--------------------------|
| Employment agreements | $20,000 | $16,372 |
| Customer list | 155,000 | 130,978 |
| Noncompete | 1,200 | 1,489 |
| Total | 176,200 | 148,839 |

Thus, $8,051 of the class III assets is not classified on the

Form 8594.

Schedule L, Balance Sheet, filed with the 1992 return

reflected the following assets, liabilities, and stockholders'

equity at the beginning and end of that year:

| Item | Beginning of year | End of year |
|---|---|---|
| Assets: | | |
| Cash | $295 | -- |
| Trade notes and accounts receivable | 10,034 | -- |
| Loans to stockholders | 131,940 | $111,484 |
| Buildings & other depreciable assets less accumulated depreciation | 20,383 | 816 |
| Other assets (goodwill) | 13,700 | -- |
| Total assets | 176,352 | 112,300 |
| | | |
| Liabilities and stockholders' equity: | | |
| Accounts payable | 35,653 | 28,898 |
| Loans from stockholders | 19,500 | -- |
| Mortgages, notes, bonds payable in 1 year or more | 137,250 | -- |
| Capital stock: | | |
| Common stock | 10,000 | 10,000 |
| Retained earnings-- Unappropriated | (26,051) | 73,402 |
| Total liabilities and stockholders' equity | 176,352 | 112,300 |

Petitioner signed and filed Mid-Nebraska's Form 1120, U.S. Corporation Income Tax Return, for the year ended December 31, 1993 (1993 return), on or about September 15, 1994. The 1993 return indicated that it was a final return.

A Schedule L, Balance Sheet, filed with the 1993 return reflected the following assets, liabilities, and stockholders' equity at the beginning and end of the year:

| Item | Beginning of year | End of year |
|---|---|---|
| Assets: | | |
| Loans to stockholders | $111,484 | $111,484 |
| Buildings & other depreciable assets less accumulated depreciation | 816 | 816 |
| Total assets | 112,300 | 112,300 |
| | | |
| Liabilities and stockholders' equity: | | |
| Accounts payable | 28,898 | 28,898 |
| Capital stock: | | |
| Common stock | 10,000 | 10,000 |
| Retained earnings-- Unappropriated | 73,402 | 73,402 |
| Total liabilities and stockholders' equity | 112,300 | 112,300 |

The State of Nebraska statutorily dissolved Mid-Nebraska on or about April 16, 1993, for failure to pay fees and occupation taxes. When Mid-Nebraska was dissolved, petitioner was its president and sole shareholder.

When Mid-Nebraska ceased business, its books showed the following asset accounts and balances:

| Account No. | Description | Balance |
|---|---|---|
| 106 | Loan shareholder | $1,800 |
| 107 | Robson building account | 16,200 |
| 111 | Personal insurance | 7,876 |
| 112 | Accounts receivable-Robson | 52,432 |
| 113 | Receivable Shareholder | 33,175 |
| Total | | 111,483 |

Account No. 113 reflected the original amount that petitioner and Klute owed Mid-Nebraska for the purchase of the stock of Mid-Nebraska. Hereinafter, accounts Nos. 106-107 and 111-113

collectively will be referred to as the loans to shareholder accounts.

On audit respondent determined that petitioners had unreported income from a capital gain of $50,227 they received as a result of the liquidation of Mid-Nebraska. Respondent calculated that net capital gain as follows:

```
Assets per balance sheet at dissolution:
 Loans to shareholder                  $111,484
 Net depreciable assets                     816
  Total assets                                      $112,300
Less liabilities per balance sheet
 at dissolution:
 Accounts payable                                     28,898
  Net liquidating dividend                            83,402
Less basis in stock                                   33,175
 Capital gain from liquidating
  distribution                                        50,227
```

OPINION

Amounts distributed to a shareholder in complete liquidation of a corporation are treated as full payment in exchange for the stock of the corporation. See sec. 331(a)(1). The gain or loss to a shareholder from a liquidating distribution is determined under section 1001 by subtracting the cost or other basis of the stock from the amount of the distribution. See sec. 331(c); sec. 1.331-1(b), Income Tax Regs. Where a corporation cancels a debt owed to it by a shareholder in connection with a complete liquidation, the amount of the debt is treated as a distribution under section 331(a)(1). See Alexander v. Commissioner, 61 T.C. 278, 289 (1973) (citing Weisberger v. Commissioner, 29 B.T.A. 83

(1933)); see also <u>Merriam v. Commissioner</u>, T.C. Memo. 1995-432, affd. without published opinion 107 F.3d 877 (9th Cir. 1997); <u>Levy v. Commissioner</u>, T.C. Memo. 1960-22 (corporation made a de facto distribution to its sole shareholder relating to the complete liquidation of the corporation in the amount he owed the corporation for advances it had made to him).

Petitioners deny that petitioner received any liquidating distribution from Mid-Nebraska. Thus, they contend, he realized no capital gain during 1993 relating to the dissolution of that corporation. Respondent, on the other hand, contends that the statutory dissolution of Mid-Nebraska caused a de facto liquidation of that corporation's assets. Thus, respondent asserts, petitioner received a net liquidating distribution during 1993 from Mid-Nebraska of $83,402. Respondent maintains that, after subtracting his basis in the Mid-Nebraska stock of $33,175, petitioner realized a capital gain of $50,227 relating to the dissolution of that corporation.

Petitioners admit that when Mid-Nebraska ceased business, the corporate books showed balances in the loans to shareholder accounts totaling $111,483 and that the balance sheet filed with Mid-Nebraska's final return showed as an asset loans to shareholder totaling $111,484. Nevertheless, they insist that Mid-Nebraska never lent any money to them or paid any of their personal expenses. Rather, they claim, the loans to shareholder

accounts reflected on the corporate books when York acquired Mid-Nebraska's business must have been made in error.

From their briefs, it appears that petitioners are under the mistaken belief that respondent has the burden of proof in the instant case. Generally, however, the Commissioner's determinations are presumed correct, and taxpayers have the burden of proving that the Commissioner's determinations are erroneous.[3] See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Page v. Commissioner</u>, 823 F.2d 1263, 1271 (8th Cir. 1987), affg. in part and dismissing in part T.C. Memo. 1986-275.

Other than their descriptive titles, the record contains no evidence explaining the nature of the loans to shareholder accounts. Furthermore, evidence relating to the accuracy of the loans to shareholder accounts consisted solely of petitioner's testimony. We are not required to accept the self-serving testimony of interested parties, however, particularly in the absence of persuasive corroborating evidence. See <u>Day v. Commissioner</u>, 975 F.2d 534, 538 (8th Cir. 1992), affg. in part, revg. in part and remanding T.C. Memo. 1991-140; <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 212 (1992); <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

---

[3]The burden of proof provisions of sec. 7491 do not apply here because the examination in this case began before July 22, 1998. See Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 685, 724.

It is not enough for petitioners to claim that the entries recording loans to shareholder must have been made in error.  The record makes it abundantly clear that petitioner was ignorant about financial and accounting concepts when he purchased Mid-Nebraska's stock and continuing at least through  the audit of petitioners' 1993 return.  It is also obvious that petitioner made no effort to acquaint himself with Mid-Nebraska's financial records or the accounting entries made on those records or the data reported on the corporate tax returns.

Petitioner testified that he did not know of what the loans to shareholder accounts consisted and that he was not even aware that Mid-Nebraska's books reflected loans to shareholder until after York took over the corporation's business.  He testified further, however, that he did not understand the corporate books and relied totally on in-house bookkeepers to keep the corporate books and on outside accountants to prepare the corporate tax returns.  He stated additionally that when he reviewed the corporate books, he checked only for the amount of premiums he had written each month.

Petitioner failed to present any testimony from individuals involved in preparing Mid-Nebraska's books and tax returns who could explain the nature of the loans to shareholder accounts included on Mid-Nebraska's books or otherwise establish that the accounting entries were made in error.  The failure of a party to

introduce evidence that is within his or her control gives rise to a presumption that the evidence, if provided, would be unfavorable to the party who has control over the evidence. See O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959), affg. 28 T.C. 698 (1957); Cluck v. Commissioner, 105 T.C. 324, 338 (1995); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Accordingly, we find that petitioners did not establish satisfactorily that the loans to shareholder accounts depicted on Mid-Nebraska's books when it ceased its business resulted from erroneous bookkeeping entries or constituted compensation. See Hash v. Commissioner, 273 F.2d 248, 250-251 (4th Cir. 1959), affg. T.C. Memo. 1959-96; Allen v. Commissioner, 117 F.2d 364, 368 (1st Cir. 1941), affg. a Memorandum Opinion of this Court; see also Bartel v. Commissioner, 54 T.C. 25 (1970).

Petitioners contend additionally, in essence, that even if the bookkeeping entries on Mid-Nebraska's books showing loans to petitioner were accurate, the loans to shareholder accounts no longer existed in 1993 when the State of Nebraska statutorily dissolved Mid-Nebraska. According to petitioners, loans to shareholders constitute accounts receivable, and York acquired all of Mid-Nebraska's accounts receivable during 1992; therefore, petitioners contend, Mid-Nebraska had no asset consisting of loans to shareholders to distribute to petitioner when the State

of Nebraska statutorily dissolved Mid-Nebraska. Respondent, however, contends that York acquired only Mid-Nebraska's marketable assets, i.e., its customer list and accounts receivable, and that those assets did not include the accounts. According to respondent, the only Mid-Nebraska receivables York acquired consisted of money owed to Mid-Nebraska for insurance premiums.

Petitioners rely on the statement in the letter of intent that Mid-Nebraska "proposes to sell their corporation, including all assets, to York" as proof that York acquired the loans to shareholder accounts reflected on Mid-Nebraska's books when it took over Mid-Nebraska's business. That document, however, specifically stated that its terms were temporary and subject to further detail. Therefore, we do not find it conclusive proof that York intended to acquire, or actually acquired, the loans to shareholder accounts when it acquired Mid-Nebraska's business.

Petitioners also rely on the acquisition agreement as proof that York acquired the loans to shareholder accounts. We find that document ambiguous, however. The acquisition agreement stated that York was acquiring "Mid-Nebraska Insuror's fixed assets and good will." We are aware that the agreement stated further that the purchase price of the acquisition would be an amount not exceeding $167,000 calculated on the total of specified items of which "Accounts Receivable" is included. The

agreement, however, did not define what items constituted accounts receivable or otherwise indicate whether the loans to shareholder accounts were included or excluded.  Petitioners contend that the term "accounts receivable" includes loans to shareholders.  We, however, find the meaning unclear.

Black's Law Dictionary (7th ed. 1999) defines the term "account receivable" to mean "An account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services."  Kohler's Dictionary for Accountants (6th ed. 1983) further defines the term to mean "A claim against a debtor, generally on <u>open account</u>, its application <u>usually limited</u> to uncollected amounts of completed sale of goods and services; distinguished from deposits, accruals, and <u>other items not arising out of everyday transactions</u>."  (Emphasis added.)  One accounting textbook explains that

> The term "receivables" refers to amounts due from individuals and other companies.  Receivables are claims that are expected to be collected in cash.  Receivables are frequently classified as (1) accounts, (2) notes, and (3) other.
>
>     <u>Accounts receivable</u> are amounts owed by customers on account.  They result from the sale of goods and services. * * *
>
> \*       \*       \*       \*       \*       \*       \*
>
>     <u>Other receivables</u> include nontrade receivables such as interest receivable, <u>loans to company officers</u>, advances to employees, and income taxes refundable.  These are unusual; therefore, they are generally

> classified and reported as separate items in the
> balance sheet. [Weygandt et al., Accounting Principles
> 324 (3d ed. 1993); emphasis added.]

See also Gehl Co. v. Commissioner, 795 F.2d 1324, 1330 (7th Cir. 1986) ("The term accounts receivable normally refers to an amount that is due in return for goods or services supplied." (Emphasis added.)), affg. in part and setting aside in part on another ground T.C. Memo. 1984-667. The record does not show whether Sack intended the term "accounts receivable" in the acquisition agreement to encompass all accounts which are broadly classified as receivables or to be limited to its more common application of a trade receivable.

Petitioner's testimony that York acquired all of Mid-Nebraska's assets was premised solely on his own understanding of the transaction. However, he had absolutely no control over what assets York wanted and acquired. There is no evidence that either Sack or his son specifically identified which of Mid-Nebraska's assets York wanted to acquire when they drafted the letter of intent or the acquisition agreement. Petitioner's ignorance of financial and accounting concepts renders his testimony alone insufficient to establish that York procured the loans to shareholder accounts when it acquired Mid-Nebraska's business, and the documents on which petitioners rely are inconclusive.

As further support for respondent's position that York did not acquire the loans to shareholder accounts, we note that "Loans to stockholder" of $111,484 are listed as an asset at yearend on both the Schedules L filed with Mid-Nebraska's tax returns for 1992 and 1993. Statements on a Federal tax return are admissions under rule 801(d)(2) of the Federal Rules of Evidence and will not be overcome without cogent evidence that they are wrong. See, e.g., Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969) ("The valuation [of license agreement] given in the return was an admission, and although it is not conclusive, the Tax Court was entitled to judge its weight as evidence."), affg. per curiam T.C. Memo. 1968-126; United States v. Hornstein, 176 F.2d 217, 220 (7th Cir. 1949) (cost of goods as shown on return were chargeable to taxpayer until he offered credible evidence that figures were in error); Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989) (values of stock reported on estate tax return are admission by taxpayer, and lower value could not be substituted without cogent proof that reported values were erroneous); Lare v. Commissioner, 62 T.C. 739, 750 (1974) ("Statements made in a tax return signed by a taxpayer may be treated as admissions."), affd. without published opinion 521 F.2d 1399 (3d Cir. 1975). Petitioners have failed to

submit cogent evidence to overcome the admission on the corporate returns that Mid-Nebraska continued to own the loans to shareholder accounts after York acquired Mid-Nebraska's business.

Petitioners have not proven that the loans to shareholder accounts did not exist when Mid-Nebraska ceased business. Accordingly, we sustain respondent's determination that petitioners realized capital gain during 1993 from a liquidation distribution petitioner received from Mid-Nebraska when it was statutorily dissolved in that year.

Although petitioners claim to have made additional capital contributions to Mid-Nebraska between February 1982 and September 8, 1992, they have failed to establish that they are entitled to a greater basis for petitioner's stock than the amount allowed by respondent. Accordingly, we hold that petitioner's basis in the Mid-Nebraska stock was $33,175 when the corporation was dissolved.

We have carefully considered all remaining arguments made by the parties for a result contrary to that expressed herein,[4] and, to the extent not discussed above, find them to be irrelevant or without merit.

---

[4]On brief, petitioners do not address the inclusion or accuracy of the net depreciable assets or the accounts payable amounts shown above. Accordingly, we treat those amounts as conceded by petitioners. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

To reflect the foregoing,

Decision will be entered

for respondent.