T.C. Summary Opinion 2015-31

UNITED STATES TAX COURT

DARREL W. WYATT, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13215-12S L.                    Filed April 20, 2015.

Darrel W. Wyatt, pro se.

Sean P. Deneault, for respondent.

SUMMARY OPINION

ARMEN, Special Trial Judge:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1] Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Pursuant to section 6330(d)(1), petitioner seeks review of respondent's determination sustaining a proposed levy to collect his self-reported but unpaid Federal income tax liability for 2009. Petitioner challenges the existence of such liability to the extent that it arose from income from cancellation of indebtedness. Petitioner also challenges the existence or amount of his self-reported addition to tax for failure to pay estimated tax. Finally, petitioner challenges the existence or amount of an addition to tax for failure to timely pay that respondent assessed after petitioner failed to satisfy his self-reported tax liability.

The principal issue for decision is whether the forgiveness of a loan gave rise to income from cancellation of indebtedness. The Court must also decide whether petitioner is liable for an addition to tax for failure to pay estimated tax and an addition to tax for failure to timely pay tax reported on a return.

---

[1] Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code as amended and in effect at all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

Some of the facts have been stipulated, and they are so found. We incorporate by reference the stipulated facts and the related exhibits.

Petitioner resided in the State of Florida at the time that the petition was filed.

### Petitioner's Profession

Petitioner is a physician. He graduated from the University of Arkansas College of Medicine at Little Rock in 1978 and is board certified in obstetrics and gynecology.

### Recruitment of Petitioner by Putnam Community Medical Center

In 2006 petitioner moved to Putnam County, Florida. Putnam County, which is in the interior of the State, is rural and among Florida's poorer counties. It is also medically underserved.

When petitioner moved to Putnam County, he became affiliated with the Putnam Community Medical Center (hospital) in Palatka, the county seat. Petitioner's affiliation with the hospital continued uninterrupted through the date of trial.

Petitioner was recruited to practice in Putnam County by the hospital as part of its effort to better serve the community's health needs. In furtherance of that

effort, petitioner and the hospital entered into a Recruiting Agreement, pertinent provisions of which provided as follows:

THIS RECRUITING AGREEMENT is made and entered into this 1st day of July 2006, by and between Darrel Wyatt, M.D. (hereinafter "Physician") and Putnam Community Medical Center (hereinafter "Hospital").

WITNESSETH:

WHEREAS, Physician has agreed to relocate to, and commence the private practice of medicine in, the geographic area served by the Hospital [in] Palatka, FL (the "Community"), and

WHEREAS, there is a need in the Community for the medical services provided by Physician, and

WHEREAS, Hospital desires to assist Physician in establishing his practice;

NOW, THEREFORE, Physician and Hospital hereby agree as follows:

1. Physician shall, on or before July 1, 2006, engage in the full-time private practice of medicine as a Gynecologist in the Community.

2. In order to assist in the establishment of Physician's practice as described herein, Hospital agrees to provide the assistance described in the following addenda which are executed simultaneously herewith and shall be deemed to be a part of this Agreement:  * * *

   _x_  Net Collectable Revenue Guarantee With Repayment Forgiveness

\*　　\*　　\*　　\*　　\*　　\*　　\*

4.   Physician shall maintain active Medical Staff membership and privileges in good standing and comply fully with Hospital's rules, regulations and Medical Staff Bylaws, and Physician agrees to engage in the private practice of medicine as a gynecologist in the Community on a full-time permanent basis for at least 48 months after Physician commences said private practice.

5.   At all times during the term of this Agreement, Physician shall be available for emergency room coverage for patients at Hospital's emergency room \* \* \* .

6.   At all times during the term of this Agreement, Physician is and shall be an independent contractor and not a servant, agent, or employee of Hospital \* \* \* .

As one of the simultaneously executed addenda to the Recruiting Agreement between petitioner and the hospital, an addendum denominated Net Collectable Revenue Guarantee With Repayment Forgiveness (hereinafter, Revenue Guarantee/Repayment Forgiveness addendum) provided in part as follows:

This Addendum is attached to, made a part of, and executed simultaneously with that certain Recruiting Agreement between \* \* \* [Physician and hospital] dated the 1st day of July 2006.

1.   Hospital hereby agrees to loan Physician certain amounts of money which Hospital shall advance as a guarantee of Gross Cash Receipts (as defined in Paragraph 2 hereinafter) for Physician of Thirty-Two Thousand Nine Hundred Fifty Three Dollars ($32,953.00) (hereinafter the "Guarantee Amount") per month for a period of twelve (12) months (hereinafter the "Guarantee Period")

beginning on the first date Physician actively commences the private practice of medicine in the Community. * * * Gross Cash Receipts and any Guarantee Amount Payments are to be used to cover the expenses of Physician's medical practice and provide income to Physician.

2. At the end of each calendar month during the Guarantee Period, Hospital shall pay to Physician the amount by which Physician's Gross Cash Receipts are less than the Guarantee Amount. The amount so paid shall be the "Guarantee Payment." * * * As used herein, the term "Gross Cash Receipts" shall mean all cash collected by Physician from all phases from the practice of medicine from any and all sources whatsoever, regardless of location, including, but not limited to, office calls, hospital practice, nursing homes and emergency room treatments.

3. * * * Further, if during any month Physician's Gross Cash Receipts exceed the monthly Guarantee Amount, Physician shall immediately forward payment to Hospital along with Physician's statement of Gross Cash Receipts in an amount equal to one hundred percent (100%) of such excess amount ("Excess") for the month, up to the amount of total Guarantee Payments made by Hospital to Physician pursuant to this Agreement. * * * If at any time during the term of this Agreement, Physician's Gross Cash Receipts total $395,436, the Hospital shall have no further obligation to pay Physician any amounts hereunder.

*    *    *    *    *    *    *

5. At the end of the Guarantee Period, an audit of Physician's financial records shall be performed by a representative of Hospital to determine Physician's total Guarantee Payments for the Guarantee Period not otherwise recouped pursuant to any other provision of this Addendum, as well as other amounts due from Physician to Hospital in accordance with the terms of other Addenda attached to the Recruiting Agreement. This total amount shall be the "Loan Repayment Amount."

Physician's repayment of the Loan Repayment Amount shall be due and payable immediately unless Physician requests a deferred payment plan. If the payment plan is to extend longer than six (6) months, Physician's obligations shall be evidenced by a promissory note from Physician to Hospital. Such note shall bear interest at the fixed rate of prime plus one percent (1%), with interest accruing from the end of the Guarantee Period. Physician shall also grant Hospital a perfected security interest in Physician's accounts receivable and/or other assets to be determined at Hospital's sole discretion. Physician shall cooperate fully with Hospital's efforts to obtain repayment.

6. Notwithstanding the provisions of Paragraph 5 of this Addendum, in recognition of the fact that Physician is initiating a start-up, initial practice and to induce Physician to remain in the Community beyond the Guarantee Period, Hospital agrees that it will forgive and cancel one thirty-sixth (1/36th) of the Loan Repayment Amount for each full calendar month Physician: (i) remains in the full-time practice of medicine in the Community after the end of the Guarantee Period; (ii) maintains active Medical Staff membership and privileges in good standing at the Hospital; and (iii) remains available for emergency room coverage for patients of Hospital's emergency room, including without limitation unassigned call coverage.

On July 5, 2006, petitioner and the hospital entered into an additional addendum to the July 1, 2006, Recruiting Agreement. This additional addendum was denominated Advance On Net Collectable Revenue Guarantee (hereinafter, Advance On Revenue Guarantee addendum), and it provided in pertinent part as follows:

WHEREAS, Hospital and Physician executed that certain Net Collectible Revenue Guarantee With Repayment Forgiveness Addendum (the "Guarantee Addendum") simultaneously with the [Recruiting] Agreement for the purpose of loaning certain amounts of

money to Physician to cover Physician's medical practice expenses and provide income to Physician; and

WHEREAS, Hospital desires to advance to Physician a portion of the Guarantee Amount,

NOW THEREFORE, Hospital and Physician hereby agree as follows:

1.  Upon request of Physician, Hospital shall advance to Physician the Guarantee Amount of Thirty-two thousand nine hundred fifty-three and 00/100 Dollars ($32,953.00) in up to one (1) monthly installment prior to Physician's start date (the "Advancement Period").

2.  Physician's Guarantee Amount in month Twelve (12) will be reduced by the amount advanced to Physician during the Advancement Period. * * *

During the Guarantee Period petitioner received net Guarantee Payments of $260,627 from the hospital pursuant to the July 1, 2006, Recruiting Agreement and its two relevant addenda, i.e., the Revenue Guarantee/Repayment Forgiveness addendum and the Advance On Revenue Guarantee addendum.

Since signing the July 1, 2006, Recruiting Agreement and its addenda, petitioner has, consistent with the terms of paragraph 6 of the Revenue Guarantee/Repayment Forgiveness addendum, (1) continuously remained in the full-time practice of medicine in the geographic area served by the hospital, (2) maintained an active medical staff membership and privileges in good standing

at the hospital, and (3) been available for emergency room coverage for patients at the hospital's emergency room. Accordingly, because petitioner complied with all of the terms of paragraph 6 of such addendum, the hospital ratably forgave and canceled the following amounts of the net Guarantee Payments of $260,627 that petitioner had received from the hospital during the Guarantee Period:

| Year | Payment Amount Forgiven & Canceled | Proportion of Total Forgiven & Canceled |
|------|------------------------------------|------------------------------------------|
| 2007 | $43,437.84 | 6/36 |
| 2008 | 86,875.68 | 12/36 |
| 2009 | 86,875.68 | 12/36 |
| 2010 | 43,437.84 | 6/36 |
| | 260,627.04 | 36/36 |

As previously stated, upon the completion of the Guarantee Period petitioner remained in the full-time practice of medicine in Putnam County, maintained his affiliation with the hospital, and otherwise complied with all terms and requirements of the July 1, 2006, Recruiting Agreement and its relevant addenda. Accordingly, at the end of the Guarantee Period petitioner had no reason to (and did not) formally request a deferred payment plan, nor did he execute a promissory note or grant the hospital a perfected security interest in his accounts

receivable or other assets pursuant to paragraph 5 of the Revenue Guarantee/Repayment Forgiveness addendum.[2]

Petitioner's Income Tax Returns for 2007-10

Petitioner filed Federal income tax returns for 2007 through 2010 and attached to each return a Schedule C, Profit or Loss From Business, reporting net profit from his practice as a physician in Palatka, Florida. Petitioner included as "Other income" in Part I (Income) of each Schedule C the amount forgiven and canceled by the hospital pursuant to paragraph 6 of the Revenue Guarantee/Repayment Forgiveness addendum. Petitioner's reporting of such amounts was consistent with Forms 1099-MISC, Miscellaneous Income, that he received from the hospital for each of the years 2007 through 2010, which forms

---

[2] In this regard the record includes a letter dated September 26, 2013, from the hospital's chief executive officer that states in part as follows:

> Dr. Wyatt remained in the Community and complied with all of the terms of the Recruiting Agreement, thereby his personal obligations were met, and no promissory note for loan repayment was * * * [sought] by the Hospital.

> Based upon Dr. Wyatt's satisfactory completion of all terms pursuant to the Recruiting Agreement with * * * [the Hospital], the loan amounts were cancelled and forgiven, and thereby no promissory note was required, and no collection efforts were made for Dr. Wyatt['s loan].

reported the payment of nonemployee compensation in the amounts forgiven and canceled by the hospital pursuant to paragraph 6 of the foregoing addendum.

For 2008, the taxable year preceding the one in issue, petitioner reported total tax of $37,995 on his income tax return.

Additional Facts Regarding Petitioner's 2009 Return

Petitioner's income tax return for 2009 was prepared by a certified public accountant and timely filed pursuant to an extension.

On his return petitioner listed his filing status as single, and he reported total tax of $32,625, which included self-employment tax from his medical practice. Petitioner claimed no payments or credits against total tax. Specifically, petitioner made no estimated tax payments, and he reported an estimated tax penalty of $781, thereby resulting in a total reported amount due of $33,406 (i.e., $32,625 + $781). Petitioner did not remit with his return payment for any part of the reported amount due.

Respondent assessed the tax and estimated tax penalty reported by petitioner on his return. Respondent also assessed an addition to tax under section 6651(a)(2) for failure to timely pay the tax reported on the return as well as statutory interest.

Collection Activity

After petitioner failed to pay any part of his tax liability for 2009, respondent issued a Final Notice of Intent to Levy for that year. In response, petitioner timely filed a Form 12153, Request for a Collection Due Process or Equivalent Hearing.[3]

In his Form 12153 petitioner expressed interest in an offer-in-compromise, and during the course of the administrative hearing petitioner submitted a Form 656-L, Offer in Compromise (Doubt as to Liability), seeking to compromise his tax liabilities for 2007 through 2010, the four years for which the hospital forgave and canceled amounts pursuant to paragraph 6 of the Revenue Guarantee/Repayment Forgiveness addendum.[4] In contrast, petitioner never

---

[3] In his Form 12153 petitioner referenced three taxable years: 2007, 2008, and 2009. The record in the instant case does not include a copy of the final notice that prompted petitioner to file the Form 12153, nor does the record include a transcript of account for any year other than 2009. As discussed infra in the text, the offer-in-compromise based on doubt as to liability that petitioner subsequently submitted referenced 2007 through 2010, i.e., the four taxable years for which amounts were forgiven and canceled by the hospital. However, as will be shown infra in the text, the notice of determination upon which the instant case is based was issued solely in respect of petitioner's outstanding liability for 2009. In short, the status of petitioner's accounts for 2007, 2008, and 2010 is not definitively disclosed in the record; in any event, those years are not before the Court in the instant case. See sec. 6330(d)(1).

[4] Petitioner did not make any other offer during the administrative hearing.

proposed a collection alternative based on doubt as to collectibility, nor did he ever propose an installment agreement or submit a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, or other financial information regarding his ability to pay.

In his aforementioned offer-in-compromise based on doubt as to liability, petitioner proposed to satisfy outstanding tax liabilities for 2007 through 2010 for $20,055, an amount roughly equaling the sum of the taxes for those four years calculated by him without regard to the amounts forgiven and canceled by the hospital.[5]  Respondent's settlement personnel considered petitioner's offer-in-compromise, but ultimately rejected it because "doubt as to liability was not established."

During the course of the administrative process petitioner never submitted a Form 843, Claim for Refund and Request for Abatement, nor did he otherwise request that interest be abated.

After respondent issued a notice of determination, petitioner commenced the instant case.  As acknowledged in the petition, the notice of determination (as well as the attachment thereto) addressed only the taxable year 2009.  See supra note 3.

---

[5] The calculations were expressed on amended returns--Forms 1040X, Amended U.S. Individual Income Tax Return--submitted by petitioner in conjunction with his offer.

Discussion

I. Administrative Hearings Under Section 6330

Section 6331(a) authorizes the Commissioner to levy upon property and rights to property of a taxpayer who is liable for taxes and who fails to pay those taxes within 10 days after notice and demand for payment is made. Section 6331(d) provides that the levy authorized in section 6331(a) may be made only if the Commissioner has given notice to the taxpayer no less than 30 days before the day of the levy.

Section 6330(a) also provides for notice and, in addition, confers on the taxpayer the right to request a pre-levy administrative hearing. Sec. 6330(a)(3)(B), (b); see Davis v. Commissioner, 115 T.C. 35, 37 (2000); Goza v. Commissioner, 114 T.C. 176, 179 (2000). If such a hearing is requested, the hearing is conducted by the IRS Office of Appeals. Sec. 6330(b)(1).

At an administrative hearing the taxpayer may raise any relevant issue and may make an offer of a collection alternative, such as an offer-in-compromise or an installment agreement. Sec. 6330(c)(2)(A)(iii). A taxpayer may also challenge the existence or amount of the underlying tax liability but only if the taxpayer did not receive a statutory notice of deficiency with respect to the liability or did not otherwise have an opportunity to dispute it. Sec. 6330(c)(2)(B).

## II. Judicial Review

### A. In General

A determination made by the IRS Office of Appeals under section 6330 to sustain a proposed levy may be reviewed by this Court. Sec. 6330(d)(1); see Rules 330-334. In general, upon review of a notice of determination sustaining a collection action the Court will limit its review to those issues properly raised during the administrative hearing. Giamelli v. Commissioner, 129 T.C. 107, 114-115 (2007); Magana v. Commissioner, 118 T.C. 488, 493 (2002). Where the underlying tax liability is properly at issue, the Court reviews the determination de novo. Goza v. Commissioner, 114 T.C. at 181-182. Where the underlying tax liability is not at issue, the Court reviews the determination for abuse of discretion. Id. at 182; see also Sego v. Commissioner, 114 T.C. 604, 610 (2000).

### B. Right To Challenge the Underlying Liability

Respondent concedes that petitioner properly raised the issue of his underlying liability for 2009 during the administrative hearing because petitioner never received a statutory notice of deficiency nor otherwise had a prior opportunity to challenge either his self-reported liability or the addition to tax under section 6651(a)(2) for failure to timely pay. As a consequence, respondent concedes, and the Court agrees, that petitioner may challenge his underlying

liability for 2009. <u>See</u> sec. 6330(c)(2)(B); <u>Montgomery v. Commissioner</u>, 122 T.C. 1 (2004) (holding that a taxpayer may challenge self-assessed tax liability in an administrative hearing if the taxpayer did not have a prior opportunity to challenge such liability). Accordingly, the Court proceeds to review petitioner's underlying tax liability for 2009 <u>de novo</u>. <u>See Goza v. Commissioner</u>, 114 T.C. at 181-182.

III. <u>Petitioner's Underlying Liability for 2009</u>

A. <u>Loan Amounts Received From the Hospital</u>

The parties agree that the amounts received by petitioner from the hospital pursuant to the Revenue Guarantee/Repayment Forgiveness addendum represented a bona fide loan. <u>See Rosario v. Commissioner</u>, T.C. Memo. 2002-70 (holding that a hospital's income guaranty with repayment forgiveness, strikingly similar to the one in the instant case, that was offered in exchange for the taxpayer's agreement to practice medicine in a rural area for at least three years was a bona fide loan). <u>But see Vancouver Clinic, Inc. v. United States</u>, No. 3:12-CV-05016-RBL, 2013 WL 1431656 (W.D. Wash. Apr. 9, 2013). The Court proceeds consistent with the parties' agreed view.

Money received pursuant to a loan is not includable in gross income at the time that it is lent because there is an obligation to repay it. <u>See Commissioner v.</u>

Tufts, 461 U.S. 300, 307 (1983). However, if the obligation to repay is forgiven or canceled by the lender, gross income may arise. See 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); see also sec. 108.

In general, cancellation of indebtedness produces income in an amount equal to the difference between the amount due on the obligation and the amount paid for the discharge. See Babin v. Commissioner, 23 F.3d 1032, 1034 (6th Cir. 1994), aff'g T.C. Memo. 1992-673. The rationale for this principle is that cancellation of indebtedness provides the debtor with an economic benefit that is equivalent to income. Kirby Lumber Co., 284 U.S. 1; see Friedman v. Commissioner, 216 F.3d 537 (6th Cir. 2000), aff'g T.C. Memo. 1998-196.

B. Whether Petitioner Received Cancellation of Indebtedness Income

Although the amount that petitioner received from the hospital pursuant to the Revenue Guarantee/Repayment Forgiveness addendum represented a bona fide loan, petitioner contends that the loan was a nonrecourse loan, i.e., that he was not personally liable for its repayment, and that, as a consequence, he did not receive income when the loan was forgiven and canceled by the hospital. The Court disagrees with the premise of petitioner's argument.

Contrary to what petitioner appears to assume, the fact that he never executed a promissory note is not determinative of personal liability. Thus, if

petitioner had failed to honor his part of the parties' bargain, there is nothing in the Recruiting Agreement that would have barred the hospital from suing him to recover the unrepaid loan amount. Indeed, paragraph 5 of the Revenue Guarantee/Repayment Forgiveness addendum stated that petitioner's repayment of the Loan Repayment Amount was due and payable immediately upon completion of the Guarantee Period unless he requested a deferred payment plan. Petitioner did not formally request a deferred payment plan, and the hospital did not choose to demand immediate payment because, consistent with the parties' expectations, he remained in the community, continued his medical practice, and maintained his affiliation with the hospital.

The possibility that petitioner might have been asked to "grant hospital a perfected security interest" if he had not remained in practice in Putnam County or had otherwise breached his obligations under the Recruiting Agreement or had been granted a deferred payment plan is not incompatible with personal liability, as personal liability is often a feature of a secured loan. In any event, there is nothing in the record to suggest that petitioner and the hospital ever entered into a security agreement. Indeed, as the hospital's chief executive officer stated, because petitioner complied with all of the terms of the Recruiting Agreement, the hospital found it unnecessary to pursue any collection remedy against him, such as

demanding a perfected security interest in his accounts receivables or other assets. In other words, the hospital assumed the risk of being (and remaining) an unsecured creditor, presumably because it had faith that petitioner would fulfill his side of the bargain. But the assumption of that risk by the hospital did not negate the fact that a loan existed in respect of which petitioner was personally liable.

Further, although the Court does not accept the premise of petitioner's contention regarding the nature of the loan, it bears mention that just because a taxpayer is not personally liable for a debt does not mean that cancellation of indebtedness cannot give rise to income. E.g., Gershkowitz v. Commissioner, 88 T.C. 984, 1010 (1987) (holding that the discharge from a portion of the liability for an undersecured nonrecourse obligation through a cash settlement gave rise to cancellation of indebtedness income).[6]

In sum, petitioner paid nothing to the hospital on his loan after the one-year Guarantee Period. Thereafter, the hospital, consistent with paragraph 6 of the Revenue Guarantee/Repayment Forgiveness addendum, forgave the balance of the loan ratably over the course of the next 36 months. Under these circumstances,

---

[6] Although informal IRS publications are not authoritative sources of Federal tax law, see Green v. Commissioner, 59 T.C. 456, 458 (1972), the Court notes that IRS Publication 4681, Canceled Debts, Foreclosures, Repossessions, and Abandonments (for Individuals), upon which petitioner relies, states that forgiveness or cancellation of nonrecourse debt can give rise to income.

forgiveness and cancellation of the loan gave rise to income.  See Cox v.

Commissioner, T.C. Memo. 1996-241 (stating that taxpayer "was not taxed on the

advances when received, but he is taxable on the discharge of the obligation to

repay them").  Accordingly, petitioner received income from cancellation of

indebtedness as reported on his 2009 return.

C.  Additions to Tax

1.  Failure To Pay Tax Reported on Return

Section 6651(a)(2) provides for an addition to tax in the case of a failure to

timely pay the amount shown as tax on a return.  The addition to tax does not

apply if the taxpayer's failure to do so was due to reasonable cause and not due to

willful neglect.

In the instant case, the record demonstrates that petitioner filed a return and

reported total tax of $32,625 for 2009; however, he did not make any prepayments

of tax, nor did he remit any payment with his return.  Thus, respondent has

satisfied his burden of production under section 7491(c), and it is incumbent on

petitioner to demonstrate that his failure to pay was due to reasonable cause and

not due to willful neglect.  See Rule 142(a)(1); Higbee v. Commissioner, 116 T.C.

438, 447 (2001).

At trial petitioner testified that he lacked sufficient income to pay his reported liability at the time that he filed his 2009 return. However, petitioner did not describe his overall financial situation, and he did suggest that he had resources other than current income upon which he could draw to satisfy his liability. In short, petitioner did not persuasively demonstrate that paying his reported liability on time would have required "the risk of a substantial financial loss" such that the addition to tax might be excused. See Merriam v. Commissioner, T.C. Memo. 1995-432, 1995 WL 522813, at *13, aff'd per order, 107 F.3d 877 (9th Cir. 1997). Accordingly, the Court holds that petitioner is liable for the addition to tax under section 6651(a)(2).

### 2. Failure To Pay Estimated Tax

With certain exceptions, section 6654(a) imposes an addition to tax in the case of any underpayment of estimated tax by an individual. A taxpayer has an obligation to pay estimated income tax for a particular taxable year if the taxpayer has a "required annual payment" for such year. Wheeler v. Commissioner, 127 T.C. 200, 210-212 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).

In the instant case, the record demonstrates that petitioner filed a return and reported total tax of $32,625 for 2009, the taxable year in issue. For the preceding year, petitioner filed a return and reported total tax in an even greater amount.

Under these circumstances, petitioner had a "required annual payment" for 2009.[7]
See sec. 6654(d)(1)(B).

Section 6654(e) sets forth several narrowly defined exceptions to this
addition to tax. However, no exception has been shown to apply. Accordingly,
petitioner remains liable for the addition to tax for failure to pay estimated tax as
self-reported on his return.

D. Interest Abatement

At trial petitioner requested for the first time that interest be abated.
However, the general rule in this Court is that on appeal of a collection
determination, judicial review is limited to those issues properly raised during the
administrative hearing. Giamelli v. Commissioner, 129 T.C. at 114-115; Magana
v. Commissioner, 118 T.C. at 493. In this regard, petitioner failed to properly
raise the issue of interest abatement at any time during the administrative hearing
by either submitting a Form 843 or otherwise making a request for interest
abatement. Accordingly, such issue may not now be considered in the judicial
proceeding. See Day v. Commissioner, T.C. Memo. 2014-215, at *11; see also

---

[7] In addition, it should be recalled that respondent never determined or asserted the addition to tax; rather, petitioner reported it on his return.

sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.; <u>cf.</u> sec. 6404(e), (h); Rules 280-284.

Conclusion

All of the arguments advanced by petitioner have been considered.[8] To the extent not expressly addressed above, the Court concludes that those arguments are without merit, moot, or irrelevant.

To give effect to our disposition of the disputed issues,

<u>Decision will be entered for</u>

<u>respondent</u>.

---

[8] For example, petitioner argues that when debt is canceled, the creditor should issue a Form 1099-C, Cancellation of Debt, and not a Form 1099-MISC. Although this may be so, the fact of the matter is that a bookkeeping error does not serve to negate income arising from the forgiveness or cancellation of debt. <u>See</u> <u>McAllister v. Commissioner</u>, T.C. Memo. 2013-96, at *6.